**William A. EGAN, Governor of Alaska, et al., Petitioners,**

v.

**Jay S. HAMMOND et al., Respondents.**

**No. 1711.**

Supreme Court of Alaska.

July 21, 1972.

Opinion Sept. 29, 1972.

---

John E. Havelock, Atty. Gen., Richard W. Garnett, III, Asst. Atty. Gen., Juneau, for petitioners.

Clifford J. Groh, of Groh, Benkert, Greene & Walter, Anchorage, for respondents.

## OPINION IN RE OBJECTIONS TO INTERIM REAPPORTIONMENT PLAN

Before BONEY, C. J., and RABINOWITZ, CONNOR, ERWIN and BOOCHEVER, JJ.

RABINOWITZ, Justice.

In our Decision and Order of May 26, 1972,[1] this court declared the reapportionment plan embodied in the December 30, 1971, Proclamation of Reapportionment and Redistricting unconstitutional under the equal protection and supremacy clauses of the Constitution of the United States of America. We reached this conclusion for the reason that the proposed plan in its overall reapportionment of the Senate and House of Representatives would have established election districts which failed to encompass "as nearly equal population proportions as is practicable." To insure compliance with the equal protection requirements of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its progeny, it was further determined that an interim reapportionment and redistricting plan, designed to meet the imminent 1972 elections, required formulation. In furtherance of this task, two Masters were appointed to assist the court in fashioning an appropriate interim reapportionment plan.

On May 26, 1972, the appointed Masters were given the following instructions in pertinent part:[2]

1. By use of the official Census of 1970, you should establish a population base for the State of Alaska. This population base should include military personnel who were enumerated in the 1970 Census.

2. You should make an inquiry to determine whether or not the number of nonresident military personnel included in the 1970 Census can be determined. If a determination can be made, then you should subtract the number from the total which you have arrived at in paragraph 1 above. You should also state the methods in detail by which you arrived at this determination.

After receipt of the Masters' Report,[3] an "Order Establishing an Interim Reapportionment Plan for 1972 Legislative Elections" was entered on June 14, 1972.[4] In its relevant part this order stated:

By use of the Official Census of 1970, the Court determines that the total population base for the State of Alaska shall

---

1. This document is attached hereto as part of an appendix to this opinion. Also included in the appendix are the Reference to Masters, Masters' Report, Order Establishing an Interim Reapportionment Plan, and Order Denying Objections to Interim Reapportionment Plan.

2. The complete letter of instructions to the masters is attached hereto as part of the appendix.

3. The Report is included in the appendix attached hereto.

4. This document is included in the appendix attached hereto.

be 302,361. This figure includes the military population residing in the State of Alaska at the time of the Official Census of April, 1970. In the time available to the Court for the preparation of the interim plan, the Court could find no feasible method of excluding some or all of the military personnel from the total population base. Moreover, computations revealed that changes in representation under the interim plan due to the inclusion of military personnel were minimal.

Subsequent to the entry of this court's order establishing an interim reapportionment plan, petitioners filed objections thereto on the stated grounds:

The Court erred in instructing the masters that the population base should include all military personnel who were enumerated in the 1970 census and in allowing nonresident military personnel enumerated by the census to be counted for the purpose of determining the population size and shape of particular districts. . . .

Petitioners contended that the effect of the inclusion of all enumerated military personnel was to give greater political power to those communities which adjoin major military installations. In arguing for preservation of the civilian population concept,[5] petitioners state that Alaska's legislature established a presumption against residency of military personnel except on affirmation of intent by the person involved that he chooses to be an Alaska resident.[6] In overruling petitioners' objection to the inclusion in the interim plan's population base of all military personnel who

were enumerated in the 1970 Census, in our order of June 20, 1972,[7] we said in part:

[We] could find no feasible basis for the exclusion of part or all of the military population from the population base required for interim reapportionment. Under the Alaska Constitution this base must include all residents of the State of Alaska as enumerated in the decennial census. The base is not limited to voter population. Neither the 1971 reapportionment plan nor the materials relied upon by the petitioners provide a legal basis for identifying nonresident military personnel in order to eliminate them from the population base.

In the absence of reliable data, the elimination of the military from the population base as a class of persons would be a denial of equal protection of the law, prohibited by the Fourteenth Amendment to the United States Constitution. (Footnotes omitted.)

Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609, 617 (1964), instructs that it is constitutionally impermissible to discriminate against a class of individuals merely because of the nature of their employment. Given Davis v. Mann, this court is nevertheless under the duty, pursuant to article VI, section 3 of the Alaska constitution, to employ census data in determining the total population base for purposes of formulating an interim reapportionment plan.[8] The census practice of enumeration is as follows:

In accordance with census practice dating back to 1790, each person enumerated in the 1970 census was counted as an in-

---

5. Alaska Const. art. VI, § 3 provides in part: "Reapportionment shall be based upon civilian population within each election district as reported by the census."

6. In support of this argument, petitioners cite AS 15.05.020. The 1971 Reapportionment Plan includes Coast Guard Personnel, 3,752 resident aliens, and all military dependents. These persons cannot be classified as citizens of the State of Alaska under the test urged by petitioners.

7. This order is included in the appendix attached hereto.

8. See note 1, supra. In reaching the conclusion that census data must be employed, we do no more than hold that for purposes of fashioning an interim reapportionment plan the unconstitutional limitation in art. VI, § 3 of the Alaska constitution is severable.

habitant of his usual place of residence, which is generally construed to mean the place where he lives and sleeps most of the time. This place is not necessarily the same as his legal residence, voting residence or domicile.[9]

In light of the unconstitutionality of the civilian-military distinction made in article VI, section 3 of the constitution of Alaska for purposes of determining the requisite population base and this provision's further requirement that Alaska's population base be computed from census data, we concluded that in fashioning an interim reapportionment plan no lawful requirement or reliable basis existed for isolation and exclusion from the total population base of those military or civilians who were living in Alaska and enumerated in the 1970 census but did not at the time possess the intent of making Alaska their home. Alaska's constitution requires that the requisite population total be arrived at by use of the census data. It does not mandate a population base composed exclusively of registered voters, citizens who have previously voted in Alaska, or only those people living in Alaska with the intention of making Alaska their home.[10]

It is for these reasons that this court decided that petitioners' objections to the inclusion of all military personnel, who were enumerated in the 1970 census in the total population base for purposes of determining an interim reapportionment plan should be overruled.[11]

BOOCHEVER, Justice (dissenting).

I dissent from so much of the court's order as overrules petitioners' objection to inclusion, under the court's interim reapportionment plan, of all military personnel who were enumerated in the 1970 Census for the purpose of determining the population size and shape of particular districts.

I agree with the majority that it is impermissible to discriminate against a class of individuals because of the nature of their employment without more being shown, Davis v. Mann, 377 U.S. 678, 691, 84 S.Ct. 1441, 12 L.Ed.2d 609, 617 (1964), just as it is unconstitutional to deprive members of a class such as the military of their right to vote, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

The United States Supreme Court, however, has recognized the problems created by including in population counts proportionately large numbers of military personnel (and other transients) having few ties with the state in which they are physically present. In Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), the Court affirmed the use of a registered voter base for Hawaii knowing that this system eliminated a much higher proportion of military than civilian persons. The Court indicated its approval of state citizen population as a permissible population base. Id. at 92–95, 86 S.Ct. at 1296–1298, 16 L.Ed. 2d at 391–92.

The use in Alaska of the April 1970 Census figures for civilians in effect established a state citizen population base for

9. Census Report PC(1)–C3, Alaska, Appendix A, at App–1.

10. See note 6, supra.

11. The relative effect of eliminating all military personnel, of eliminating only military personnel housed in group quarters, or of including all military personnel in this court's interim reapportionment plan, would be to produce only a slight change in the base population figure and to necessitate some minor redrawing of district lines; it would not change the number of legislators in any given district. On the other hand, elimination of military personnel housed in group quar-

ters would result in substantially increased population variances among the election districts in comparison with the minimal variations present in the interim reapportionment plan as it now stands. For example, the variation in the Juneau district would shift from the present +4.3 to +10.2; in the Matanuska-Susitna district from +1.5 to +7.4; in the Aleutian district from +3.4 to —37.3; in the Yukon-Koyukuk-Kuskokwim district from +1.0 to —6.5; and in the Fairbanks district from +0.1 to —7.1. Excluding military personnel living in group quarters would correct the Ketchikan discrepancy from —22.5 to —18.0.

other than military. The April date effectively eliminated the large number of summer tourists and transient construction and fishing employees, leaving to be counted with minimal exceptions those voluntarily living in the state with the intention of making Alaska their home.[1]

While voting statistics are not synonymous with records of state citizenship, they do furnish a significant indication of a relatively definable military group's nexus with the state. Of the 9,818 census population of military personnel and civilian employees 18 years of age and over residing on the Elmendorf and Ft. Richardson bases, only 102 persons or approximately 1 percent voted as Alaskans in the November 3, 1970 election. At Eielsen and Ft. Wainwright, 172 of 9,997 or 1.7 percent so voted. Slightly higher figures of 8.8 percent and 4 percent voted at Adak and Kodiak, while none of Shemya's 1,131 voted. Civilians were also present on most of the bases so that the percentage of military personnel voting on the bases was in all probability even more minuscule.[2] Approximately 52 percent of the remaining Alaskan population over 18 years of age residing off the bases voted in the same election. (Masters' Report, Table 9) Moreover, according to the files of the Alaska Command, there are only 190 Alaskan "residents of record" among Army and Air Force personnel stationed in Alaska.

In my opinion, some adjustment with reference to counting military personnel is necessary in order to accomplish the substantive purpose of establishing equal population districting "as nearly as practicable."[3] If those physically in Alaska were to be counted in the middle of the

summer when tourists and transient workers are present in vast numbers, a distorted population base would result. The counting of all military personnel regardless of their actual state residency results in a similar distortion.

As indicated in footnote 2 above, of Adak's population of 4,995 officers, enlisted men and dependents, and 450 civilians (a total of 5,445) only 165 could be induced to register as Alaskan voters, even after an extensive registration campaign. Under the court's interim reapportionment plan the ideal number of people to be represented by one legislator was fixed at 7,559. In areas such as the district embodying Adak, a relatively small number of voters would be represented by one legislator. The inequity of counting all military personnel is further illustrated by the fact that a decision to place the Ft. Richardson total population of 10,751 in a new district including Eklutna, Birchwood, Eagle River and Chugiak, as opposed to the Anchorage Northeast District, would change the representation of each by one legislator while involving a shift of less than 102 voters based on the 1970 elections.[4]

Even for an interim plan I feel that a more equitable solution is both feasible and constitutional.

I would deduct from the population base to be used for apportionment those members of the military, unaccompanied by dependents, living in military barracks, on ships, etc. These constitute 51.9 percent of the total number of military personnel enumerated in the census. (Masters' Report, p. 886) The location of such military personnel is readily ascertainable and is set forth

---

1. A small number of aliens who would not be eligible for state citizenship are included in the census count. Military personnel also include some aliens.

2. In a memorandum submitted to the court the Lieutenant-Governor of Alaska stated that the military population of Adak consisted of 4,995 officers, enlisted men and dependents, and 450 civilians. Despite an intensive voter registration ef-

fort only 165 were registered to vote as of June 1972.

3. Kirkpatrick v. Preisler, 394 U.S. 526, 528, 89 S.Ct. 1225, 22 L.Ed.2d 519, 523 (1969). Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).

4. The court was petitioned to make such a change. The proposed change was not, however, adopted.

in Table 7 of the Masters' Report submitted to this court.[5]

Admittedly, there is no completely accurate means at our disposal for determining the number of both civilian and military persons enumerated in the census who are not Alaskan citizens. It is readily apparent, however, that the proportion of military who are not Alaskan citizens so far exceeds the proportion of nonresident civilians who may have been included in the April 1970 enumerations, that no discrimination to the military as a class will result from eliminating the military personnel unaccompanied by dependents who reside in barracks, on ships, etc. That portion of the military personnel who reside neither in their own homes nor in rented private quarters obviously have the fewest ties with the state. There are doubtlessly many other non-Alaskan citizens among the remaining off-base military personnel and their dependents so that the elimination of only the 51.9 percent constituting the personnel uaccompanied by dependents residing in barracks, on ships, etc. will actually result in the inclusion of a substantially higher number of military personnel than in all likelihood are Alaskan citizens.

The Alaska Constitution dictates that, to the extent permitted by the United States Constitution, military personnel should not be included in the population base. There can be no other reason for stating "[r]eapportionment shall be based upon *civilian* population within each election district as reported by the census." (Emphasis mine.)[6]

While I agree with the majority that all military personnel may not be excluded from the population base, the interim plan should follow as closely as feasible the intent indicated by the Alaska Constitution. For that reason the portion of the military in group quarters should be excluded as representing the minimum number of military who are not Alaskan citizens. As stated in Burns v. Richardson, "The difference between exclusion of all military and military-related personnel, and exclusion of those not meeting, [sic] a State's residence requirements is a difference between an arbitrary and a constitutionally permissible classification." 384 U.S. at 92, 86 S.Ct. at 1297, 16 L.Ed.2d at 391 n. 21. I am convinced that this pointed statement by the United States Supreme Court provides a method for us to more closely follow our own Alaska Constitution without drifting from the course of the equal protection clause of the United States Constitution. Thus, I respectfully dissent from the decision to include all of the military in the population base.

OPINION SEPT. 29, 1972

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

BOOCHEVER, Justice.

This case arises out of the 1971 reapportionment of the Alaska legislature pur-

---

5. If my colleagues had agreed to such a deduction, some slight changes would have had to be made in the districts as previously established in the interim plan. With the assistance of the Masters such alterations would not have been unduly difficult to accomplish and in my opinion would have resulted in further decreasing the population variances present in the interim reapportionment plan, especially with reference to the only substantial population variance, that of the Ketchikan District.

6. Alaska Const. art. VI, § 3. Since both the court's interim plan of reapportionment and the 1971 plan utilized census figures, I do not here reach the question of whether some other basis for determining population for reapportionment purposes may now be used in view of the unconstitutionality of a portion of the provision. I do not necessarily agree with the court's apparent conclusion that the elimination of the "civilian" requirement may be severed from the requirement of using the census as a basis for population. It may well be that the two provisions are not separable. Champlin Ref. Co. v. Corporation Comm'n, 268 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062, 1078 (1932); Dorchy v. Kansas, 264 U.S. 286, 289–290, 44 S.Ct. 323, 68 L.Ed. 686, 689–690 (1924).

suant to the mandate of article VI of the Alaska Constitution. The constitution provides for decennial reapportionment of the House of Representatives.[1] The authority to reapportion the House is vested in the Governor of the state, with the advice of a reapportionment board.[2] Since the adoption of the Alaska Constitution in 1956 the United States Supreme Court has ruled that both houses of a state legislature must be apportioned according to population.[3]

Because the Alaska Constitution made no provision for reapportionment of the Senate, we held in Wade v. Nolan [4] that on an interim basis until amendment of the Alaska Constitution the Governor had the power to reapportion the Senate in the same manner as specified by the constitution for the reapportionment of the House.

In 1971, following the 1970 decennial census, no amendment having been made to the Alaska Constitution, the Governor reapportioned both houses of the Alaska legislature. Thirteen members of the Alaska legislature then challenged the validity of the 1971 plan.[5] They urged that the percentage variations from the population norms for legislative districting violated the equal protection clauses of both the United States and the Alaska Constitutions; that the exclusion of the military from the population base was a denial of equal protection; that the Advisory Reapportionment Board was not constituted in the manner required by the Alaska Constitution; that the Governor lacked power to subdivide existing multi-member districts; that the Governor lacked power to create "designated seats" within multi-member districts; that the Governor was without authority to require incumbent Senators to stand for mid-term elections; and that the Governor exceeded his constitutional power by reapportioning the Senate.

The superior court held for the plaintiffs that the variances from population norms were so great as to render the plan invalid; that the Governor lacked the power to subdivide existing multi-member districts and to designate seats within such districts; and that the Governor could not prematurely terminate the terms of senators elected for four years.

The superior court held for the defendants that the military were properly excluded from the population base; that the Advisory Reapportionment Board was properly constituted; and that the Governor did possess the power to reapportion the Senate. The trial court directed that the matter of reapportionment of the Alaska State Legislature be sent back to the Governor and the Advisory Reapportionment Board for further consideration in accordance with the decision. Both the plaintiffs and the defendants below filed petitions for review from the superior court holdings adverse to their respective positions.

This court was mindful of the need for a speedy decision to enable election officials to prepare registration lists and ballots, to disseminate information and to afford time for election campaigns in the impending primary elections.[6] The petitions for review were filed on April 26, 1972. The time for filing briefs was accelerated and oral arguments were heard on May 23, 1972. During the course of those oral arguments, counsel were requested to recommend to this court procedures to be followed in the event that the 1971 plan was found to be constitutionally defective. It was suggested that the court fashion its own interim plan, and the Attorney General further recommended that Masters be appointed by the court.

1. Alaska Const. art. VI, § 3.

2. Alaska Const. art. VI, § 8.

3. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

4. 414 P.2d 689 (Alaska 1966).

5. Alaska Const. art. VI, § 11.

6. The date of filing for candidacies was May 31, 1972. It was extended by this court in accordance with its powers over reapportionment matters first to June 15, 1972 and then to June 30, 1972. Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

Having found in our Decision and Order of May 24, 1972,[7] that the 1971 plan contained variances from population norms which could not meet the criteria set forth by the United States Supreme Court, we reluctantly concurred with the suggestion of counsel that the court fashion an interim plan of reapportionment for the forthcoming 1972 primary and general elections. The court appointed Masters to assist in the formulation of such a plan.

The Masters presented a written report and conferred with the court on June 13, 1972. The report was modified in accordance with determinations made by the court. After objections filed by the parties were considered by the court, an Order Establishing an Interim Reapportionment Plan for the 1972 Legislative Elections was issued on June 14 with the modified report of the Masters appended thereto.[8] Because that plan is merely an interim plan, it is necessary to discuss and rule on each of the issues raised on appeal so that the Governor and his Advisory Reapportionment Board will have sufficient guidelines to devise a constitutionally acceptable permanent plan.

## I. POPULATION VARIANCES

At the outset we recognize the difficulty of creating districts of equal population while also conforming to the Alaska constitutional mandate that the districts "be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area."[9] When Alaska's geographical, climatical, ethnic, cultural and socio-economic differences are contemplated the task assumes Herculean proportions commensurate with Alaska's enormous land area. The

problems are multiplied by Alaska's sparse and widely scattered population and the relative inaccessibility of portions of the state. Surprisingly small changes in district boundaries create large percentage variances from the ideal population.[10]

Despite the possibility of belaboring this opinion we feel obliged to set forth a few of the facts which make it difficult to fit Alaska's reapportionment plan into standards established for the 48 contiguous states which preceded it into the Union. Alaska has a total land area of 586,400 square miles—as large as the entire Louisiana Purchase, and one-fifth the total area of the continental United States. Its boundaries embrace four time zones. The state contains the highest mountain on the North American continent, glaciers that exceed the size of the State of Rhode Island, and a coastline longer than the total coastline along the remainder of the continental United States. Mountain ranges which equal or exceed the length and height of the Rockies divide Alaska into five relatively isolated regions which in turn are subdivided by river systems and other geographic factors such as broad expanses of frozen tundra challenging the most advanced roadway engineering.

The 1970 Census reveals a population of 302,361 persons including members of the Armed Forces.[11] There is less population in the State of Alaska than in the cities of Omaha, Nebraska or Toledo, Ohio. The contrasting ethnic backgrounds, cultural interests and economic activities of this Alaska population are detailed in the Report of the Masters.[12]

When confronted with conditions so different from those of any other single state

---

7. The Order for an interim plan of reapportionment and the Report of the Masters are attached to this opinion as Appendix I.

8. Appendix I.

9. Alaska Const. art. VI, § 6.

10. Based on 1970 census figures, the population norm per representative is 7,559

so that a change of boundaries involving only 76 people would result in a one percent variation in the population ratio. (Masters' Report, Table A, p. 880)

11. Census Report PC(1)–C3, Alaska.

12. Appendix I, pp. 889–891.

in the continental United States, it is readily apparent that it becomes well nigh impossible to achieve the mathematical precision of equal proportions which is feasible in those other states. The situation is more analogous to that of the State of Hawaii, whose unusual difficulties [13] were recognized as potentially requiring special remedies by the United States Supreme Court in Burns v. Richardson.[14]

█ Nevertheless, the initial standard to which a state legislative apportionment plan must be held is that set forth by the Supreme Court in Reynolds v. Sims: [15]

[T]he Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable.[16]

Although the 1971 plan represented a substantial improvement in the calculus of reapportionment,[17] the new plan's variances still conflict with the guidelines set forth by the United States Supreme Court. We are, therefore, compelled to hold that the plan violates the United States constitutional guarantee of equal protection.

In the earlier reapportionment cases, the United States Supreme Court refused to articulate a strict test for what was required by the equal protection clause. In Reynolds v. Sims [18] the Court noted that "[w]hat is marginally permissible in one State may be unsatisfactory in another, depending on the particular circumstances of the case." Hence the present guidelines for reapportionment evolved on a case-by-case basis. In Swann v. Adams,[19] percentage variances in

13. The unique circumstances surrounding reapportionment in Hawaii are ably described in the opinion of Judge Pence in Burns v. Gill, 316 F.Supp. 1285 (D. Hawaii 1970).

14. 384 U.S. 73, 90–96, 86 S.Ct. 1286, 16 L.Ed.2d 376, 390–93 (1966).

15. 377 U.S. 533, 577, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 536 (1964).

16. The procedure followed by Hawaii in reapportioning its legislature in 1968 is illustrative of such "honest and good faith effort". A committee of three Senators and eight Representatives held 30 hearings before submitting its recommendations to the entire Constitutional Convention. After 15 hours of debating over a three-day period the apportionment provisions were adopted. The committee heard testimony from over 53 witnesses —political scientists, statisticians, attorneys and others—reviewed judicial decisions, analyzed apportionment and districting provisions of other state constitutions and reviewed numerous publications on the subject. Then, utilizing all those resources, the Committee formulated and adopted districting criteria. The Committee engaged an independent team of computer programmers, a statistician, and appropriate staff members, and turned over to that team the primary work of formulating and analyzing districting plans. That team, using a computer upon data gleaned from the 1966 registered voter figures for election precincts, as well as

corresponding census tracts, prepared various districting plans and maps according to the Committee's criteria. No member of the Committee or any other delegate was involved in any preparation of the various plans. That team developed 39 house districting plans covering the several islands

.  .  .  .

The foremost criterion, of course, was that the average number of registered voters per legislator shall be as nearly equal as possible. Burns v. Gill, 316 F.Supp. 1285, 1289 (D.Hawaii 1970) (Footnotes omitted.)

17. The Alaska legislature was first reapportioned in 1965. The Governor's power to reapportion the Senate was challenged in the case of Wade v. Nolan, 414 P.2d 689 (Alaska 1966). In that case, however, the plaintiffs did not question the validity of the numerical variations among districts. By the time of the Governor's proposed plan six years later, the 1965 plan engendered population variances ranging from +104.57 to —65.49 percent in the House of Representatives and from +26.19 to —23.72 percent in the Senate. In the 1971 plan, population variations were reduced to a range of +23.75 to —45.93 percent in the House, and to a range of +26.14 to —17.22 percent in the Senate.

18. 377 U.S. 533, 577–578, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506, 537 (1964).

19. 385 U.S. 440, 443–444, 87 S.Ct. 569, 17 L.Ed.2d 501, 504 (1967).

the Florida Senate from +15.09 to —10.56 and in the Florida House of Representatives from +18.28 to —15.27 were held to be impermissible "for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the population of the various legislative districts . . . ." The degree of rigidity in the requirement of equality reached its zenith in Kirkpatrick v. Preisler[20] where population variances from +3.13 to —2.84 percent were held to be invalid. The Missouri Assembly had rejected a plan with smaller variances. The Court stated:

> We reject Missouri's argument that there is a fixed numerical or percentage population variance small enough to be considered de minimis and to satisfy without question the "as nearly as practicable" standard. The whole thrust of the "as nearly as practicable" approach is inconsistent with adoption of fixed numerical standards which excuse population variances without regard to the circumstances of each particular case . . . . [T]he "as nearly as practicable" standard requires that the State make a good-faith effort to achieve precise mathematical equality. . . . Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small.[21]

■ Thus the present standard for reapportionment allows two separate justifications for deviation from the ideal population figures. The first is that variance occurring because of uncontrollable factors, despite a good faith effort to achieve mathematical precision. The second acceptable deviation is that which "the State must

justify"—the implication being that while it was a controllable deviation, other factors "incident to the effectuation of a rational state policy"[22] can be advanced in justification. However, as the Supreme Court cautioned at an early date in Reynolds v. Sims, acceptable state policies are greatly limited.

> [N]either history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation . . . . Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing.
>
> A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions.[23]

■ Only after a good-faith effort has been made to achieve precise mathematical equality may variances be permitted; and then the state has the burden of justifying in detail each such variance.[24]

The Report of the Governor's Advisory Reapportionment Board offers some of the reasons which justify greater percentage variations in Alaska districts "in terms of

---

20. 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed. 2d 519 (1969).

21. 394 U.S. at 530–531, 89 S.Ct. at 1228, 1229, 22 L.Ed.2d at 524–525 (citation omitted).

22. Reynolds v. Sims, 377 U.S. 533, 579, 84 S.Ct. 1362, 12 L.Ed.2d 506, 537 (1964).

23. Id. at 579–580, 84 S.Ct. at 1391, 12 L.Ed.2d at 537–538.

24. Kirkpatrick v. Preisler, 394 U.S. 526, 532, 89 S.Ct. 1225, 22 L.Ed.2d 519, 526 (1969); Kilgarlin v. Hill, 386 U.S. 120, 122, 87 S.Ct. 820, 17 L.Ed.2d 771, 774 (1967); Swann v. Adams, 385 U.S. 440, 443–446, 87 S.Ct. 569, 17 L.Ed.2d 501, 504–506 (1967).

rational state policy forwarded as factors unique to Alaska." The report notes for example that in some isolated areas a local population would necessarily be divided between contiguous districts, achieving numerical precision at the grave expense of depriving that community of any political power or attention from campaigning candidates.

■ For other districts, however, the Advisory Reapportionment Board offers little or no explanation for the percentage deviations which were created. For example, no explanations are given for the variations in the Yukon-Kuskokwim House District 15, the Nome House District 19, and the Yukon-Kuskokwim Senate District K which respectively were —9.2 percent, —16.7 percent and —17.29 percent from the population norm. Such disparities as exist in the Wade Hampton District 20 of —28.4 percent, and in the Bethel House District 21 of +4.9 percent cannot be justified simply because a combination of pre-existing districts or a readjustment of district lines does not produce any other "benefits" than a numerical adjustment. The need for numerical adjustment is the very focus of the mandate to reapportion. In too many districts we are forced to conclude that the disparities are without adequate

justification in terms of rational state policies to meet the stringent standards established by the United States Supreme Court.

■ It is significant to note that in no case coming before the Supreme Court have population variances approaching those of the 1971 plan been upheld, while less substantial variances have been repeatedly rejected as unconstitutional.[25] Judged by the standards set out above, we are compelled to hold that the 1971 plan is invalid since there is no adequate justification offered for the variances which range from +23.35 to —45.93 percent in the House districts, and from +26.14 to —7.2 percent in the Senate districts.[26]

## II. MILITARY PERSONNEL

The Alaska Constitution specifies that "[r]eapportionment shall be based upon civilian population within each election district as reported by the census."[27] The validity of this provision was not questioned by the parties in Wade v. Nolan,[28] although the 1965 plan eliminated military personnel from the population base. The 1971 reapportionment plan similarly limited the population base to civilians.[29] The plaintiffs below have challenged the validity of this constitutional provision, contending that the

25. *E. g.*, Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (variations from +3.13 to —2.84 percent held unconstitutional); Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967) (variations from +14.84 to —11.64 percent held unconstitutional); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967) (variations from +15.09 to —10.56 percent held unconstitutional). *Cf.* Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971) (variations from —4.8 to —7.1 percent upheld).

26. With the single exception of the Ketchikan district, the range of variations in this court's interim plan is from +4.3 to —2.7 percent in the House, and from +4.3 to —2.3 percent in the Senate. The Ketchikan variation in both House and Senate is —22.5 percent. The reasons for the Ketchikan variance are explained in the Report of the Masters at p. 892. Due to the pressure of time in adopting

interim plans, the United States Supreme Court has been much more liberal in countenancing variations which might not otherwise be acceptable. *E. g.*, Kilgarlin v. Hill, 386 U.S. 120, 121, 87 S.Ct. 820, 17 L.Ed.2d 771, 774 (1967). *See also* Burns v. Gill, 316 F.Supp. 1285, 1288 (D. Hawaii 1970) saying, "[N]o one particular area of deviation or variance from the ideal of absolute equality of voting power, per se, invalidates an apportionment plan."

27. Alaska Const. art. VI, § 3.

28. 414 P.2d 689 (Alaska 1966).

29. With the exception of members of the United States Coast Guard, uniformed military personnel were eliminated. Military dependents were counted as part of the civilian base. Coast Guard personnel were counted as civilians because they operate under the control of the Department of Transportation.

elimination of military personnel as a class violated the equal protection clauses of the United States and Alaska Constitutions.

In Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964), underrepresentation of certain districts was attempted to be justified by the state noting that a substantial number of military personnel resided in the deficient districts. In rejecting this argument, the Court stated:

> Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible.[30]

In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), a Texas attempt to deprive military personnel of the right to vote in a state election simply because of their military status was held unconstitutional.

These cases make clear that military personnel as a class cannot be deprived of the right to vote, and that they cannot be arbitrarily eliminated in a population base used to design an apportionment scheme. But while the clause of the Alaska Constitution seeking to exclude military as a class is unconstitutional, that is not to say that some military cannot be excluded as a permissible device for limiting the impact of transients and nonresidents on legislative districting.

It is also necessary to distinguish the degree of precision required in dealing with representational rights as against the strict right to vote. Carrington v. Rash indicates that if even one person is disenfranchised on any irrational ground, the scheme rendering that result must be declared invalid. On the other hand, fixing equal population counts for each legislative district is a more ephemeral and elusive goal when the mathematical precision achieved one day is destroyed the next by Alaskan society's chronic mobility. Given the fact that dilution of a voter's influence is not completely avoidable, the challenge is to arrive at the best approximation of the population to be counted without losing sight of the fact that the right of equal representation is also an individual and personal right.[31]

In light of these considerations, it becomes important to evaluate the accuracy and recency of the information relied on by the Governor's Advisory Reapportionment Board. Their report to the Governor merely stated that

> [u]niformed military personnel who are residents of Alaska and therefore, arguably not excludable under the United States Constitution were so few in number as to be negligible.

The only support for this statement offered in evidence at the trial below was a letter received from an officer of the Alaska Command at the time of the 1965 reapportionment, indicating that among the military stationed in Alaska there were only 111 "residents". There is no indication in the letter of the accuracy of the source for this information. The officer warned in his letter "that this cannot be considered an absolutely accurate figure, as military personnel records do not contain an entry showing what can be called a 'legal residence' for voting purposes. The record shows only the place the person prefers to consider as his permanent home."[32] Without inquiring to up-date the 1965 figure, or obtaining other information on the military from any source, the Board excluded all military personnel from the population base. Hence we were forced to conclude in our Order Denying Objections to the Interim Reapportionment Plan, filed June 20, 1972, that

---

30. 377 U.S. 678, 691, 84 S.Ct. 1441, 1448, 12 L.Ed.2d 609, 617 (1964).

31. Reynolds v. Sims, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506, 527 (1964).

32. In the 1970 general elections there were 632 votes cast in precincts located solely on military installations. (Masters' Report, Table 9) There are no available statistics as to what proportion of those, if any, were civilians.

[i]n the absence of reliable data, the elimination of the military from the population base as a class of persons would be a denial of equal protection of the law, prohibited by the Fourteenth Amendment to the United States Constitution.

In the short time available for devising an interim reapportionment plan, a majority of this court decided that it was not possible to compile sufficiently accurate data to provide a reasonable basis for excluding any number of military from the population base.[33] Thus we included all military personnel with an eye to the fact that our plan would only apply to this year's election, and that a more accurate assessment of the military vote can be achieved in the process of devising a permanent decennial apportionment scheme.[34]

We recognize that the substantial military population present in the state because of military orders and without intention to make Alaska their home can easily give an unbalanced representation to areas abutting their bases. But we are also mindful of the need for a permanent plan which achieves a level of accuracy of their voting participation which is closer than either including or excluding all military as a class. Thus it is incumbent upon us to discuss alternative plans which may be available to handle the problem.[35]

The United States Supreme Court in Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), permitted the use of a registered voter base for Hawaii, knowing that this system eliminated a much higher proportion of military than civilian persons. Further, the Court indicated its approval of state citizen enumeration as a permissible population base.[36]

■ Alaska has a master voter registration list [37] and the court takes judicial notice that active efforts have been made to register all eligible voters. Upon adequate notice and opportunity to register before use of such a registration list for reapportionment purposes, it would appear that an apportionment plan based on current voter registration would be permissible under the federal constitution. Likewise plans based on accurate data of state citizenship or state residency could meet the standards of the federal equal protection clause.[38]

Another problem, however, would be involved in the use of any but a census population base. As noted above the Alaska Constitution specifies that: "Reapportionment shall be based upon civilian population within each election district as reported by the *census*." (Emphasis added.) Since we have held that the provision is invalid insofar as it is based on "civilian population", a question is presented as to whether the balance of the provision is separable so as to continue to be effective, or in the alternative whether the entire provision should be stricken leaving some flexibility of choosing a population base for a new, permanent apportionment plan.

Similar problems have frequently arisen with reference to legislation. In Dorchy v. Kansas, 264 U.S. 286, 289–290, 44 S.Ct. 323, 324, 68 L.Ed. 686, 689–690 (1924), Justice Brandeis set forth the following

33. *But see* dissenting opinion of Justice Boochever in Egan v. Hammond, Opn. No. 815 (Alaska, July 21, 1972).

34. This court's opinion in Egan v. Hammond, *supra* n. 33, discusses in greater detail the reasons for the inclusion of all military personnel in the court's interim plan of reapportionment.

35. The alternatives here discussed are not intended to be an all inclusive list, but are illustrative of constitutional means of treating the problem.

36. 384 U.S. at 91, 86 S.Ct. 1286, 16 L.Ed. 2d at 390.

37. AS 15.07.120.

38. In the *Burns* case the Court noted that: The difference between exclusion of all military and military-related personnel, and exclusion of those not meeting, [sic] a State's residence requirements is a difference between an arbitrary and a constitutionally permissible classification.
384 U.S. at 92, 86 S.Ct. at 1297 fn. 21, 16 L.Ed.2d at 391, n. 21.

criteria for determining the effect on the remainder of a statute when part is found unconstitutional:

> A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad . . . . But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall.

In Champlin Refining Co. v. Corporation Comm'n, 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062, 1078 (1932) the standard was phrased as follows:

> The unconstitutionality of a part of an act does not necessarily defeat or affect the validity of its remaining provisions. Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

These criteria would appear to apply equally to a state constitutional provision as to an act of the legislature. To enforce the balance of the section in question requiring exclusive use of the census, the court should be able to find that the constitutional provision would have been enacted independently of the void reference to "civilian population".[39]

The members of the Constitutional Convention must have considered the fact that many military personnel present in Alaska do not regard this state as their home and do not actively participate in its affairs. Yet the large number of such personnel concentrated in small areas of the state is capable of distorting the representational base. Although the minutes of the Constitutional Convention are silent on the subject, it appears highly likely that this was the reason that the convention limited the reapportionment base to civilian population.

■ If the requirement to use census figures were to be retained after striking the provision which limited the base to civilian population, this apparent intent might be frustrated. Only skeletal information of location and mobility characteristics of the military can be extrapolated from census data. Because the equal protection clause of the United States Constitution requires more specific factual justification for eliminating portions of the military from the population base, we conclude that the Board and the Governor should be permitted to use alternates to the census base.[40] We thus hold that the provisions of that portion of article VI, section 3, requiring that "reapportionment shall be based upon civilian population within each election district as reported by the census" is not severable. While we so hold, we remain hopeful that before a permanent plan is created, the legislature will initiate procedures to up-date the reapportionment provisions of the Alaska Constitution by an appropriate constitutional amendment.[41]

39. Springfield Gas & Elec. Co. v. Springfield, 292 Ill. 236, 126 N.E. 739 (Ill. 1920), aff'd 257 U.S. 66, 42 S.Ct. 24, 66 L.Ed. 131 (1921); New Jersey Chapter, American Institute of Planners v. New Jersey State Bd. of Professional Planners, 48 N.J. 581, 227 A.2d 313 (N.J.1967).

40. In reaching this conclusion we are mindful of the great danger that statistical data from different sources can inadvertently be corrupted or misconstrued in the process of assimilation. We trust that the Board and the Governor will also be mindful of this possibility, and will include in the reapportionment process the statistical expertise which is necessary to ensure that such errors will not occur.

41. Suggested in Wade v. Nolan, 414 P.2d 689, 700–701 and by Justice Rabinowitz, concurring at 706. Counsel for plaintiffs stated in their briefs that a resolution initiating such an amendment would be enacted at the 1972 legislative session, but no such resolution was passed.

## III. COMPOSITION OF THE ADVISORY REAPPORTIONMENT BOARD

■ Plaintiffs have contended that the reapportionment board was not constituted as required by article VI, section 8, of the Alaska Constitution, which specifies in part: "Appointments shall be made without regard to political affiliation." There were no Republican members appointed to the reapportionment board. Since we have found that the 1971 reapportionment plan is unconstitutional, the question as to the composition of the board has become moot and we therefore do not reach that issue at this time.[42]

■ We also note that the parties stipulated that the Governor in creating the reapportionment plan was not acting from political considerations and that he did perfrom his function in good faith. Thus if there was error in the composition of the board such error was rendered harmless, as the obvious purpose of the constitutional provision was to prevent the appointment of a board whose efforts might result in a politically motivated reapportionment plan.

■ Under our decision it will be necessary to refer this matter to a reapportionment board for formulation of a permanent plan. Thus, although it is not necessary for us to rule at this time on the question of whether the 1971 reapportionment board was validly constituted, it is incumbent upon us to set forth some criteria which we determine applicable in deciding whether a board has been appointed "without regard to political affiliation", so as to withstand challenge.[43] At the outset, we recognize that this phrase is not the equivalent of requiring a "bi-partisan" board.[44] Nevertheless, in reviewing the validity of the appointment, some (although not necessarily all) of the following considerations would appear to be germane: The political affiliation of members of the board; the nature of their activities in partisan politics, particularly if from one political party only; and the expertise and general qualifications which members bring to the board.

42. *Cf.* Doe v. State, 487 P.2d 47, 53 (Alaska 1971). In that case we stated the general proposition that "we will refrain from deciding questions where the facts have rendered the legal issues moot" except "where the matter is one of grave public concern and is recurrent but is capable of evading review . . . ." We do not feel that the issue presently before us evinces the same elusiveness which would require our judgment at this time. Appointments to the Advisory Reapportionment Board are made many months before a final plan is promulgated by the Governor, and interested parties have ample time to appeal from the moment the appointments are made.

43. The defendants quite properly point out that the reapportionment board was convened on May 20, 1971, and that it conducted widely publicized hearings throughout the state during the summer of 1971. Hence the doctrine of laches might well further bar questioning the composition of the board after awaiting the outcome of its work involving the expenditure of substantial funds and the devotion of much time and effort. There was ample opportunity to bring a suit long before the completion of the board's functions. McCrocklin v. Fowler, 285 F.

Supp. 41, 45 (E.D.Wis.1968) (alternate holding). *Accord,* Gersten v. United States, 364 F.2d 850, 852, 176 Ct.Cl. 633 (1966); Nelson v. Lord, 4 Alaska 174, 182–83. (1910).

44. At the Alaska Constitutional Convention, in the discussion of the original draft of section 8 which used the word "nonpartisan" the following explanation was given:

HELLENTHAL: The word was chosen deliberately. Now an alternative and perhaps the one that the delegate has in mind would be "chosen from each of the major parties." *That alternative was specifically rejected* because [the committee] felt it placed emphasis upon political considerations on this board which as has been pointed out, it is hoped to keep. as objective as possible. Now it is true and the Committee realized that *"nonpartisan" doesn't mean that you cannot belong to a political party* . . . . [On] the contrary to use the political language, would emphasize politics, and *it is the whole purpose of this article to de-emphasize politics.* (Emphasis added.)
Convention Minutes, p. 1958.

## IV. CREATING SINGLE-MEMBER DISTRICTS FROM MULTI-MEMBER DISTRICTS

The Alaska Constitution specifically authorizes the Governor to redistrict "by changing the size and area of election districts . . . "[45] subject to certain restrictions set forth in the constitution. It is thus clear that the Governor is authorized to redistrict by changing boundaries and areas. The creation of single-member districts from multi-member districts would appear to be a concomitant power under the authorization to redistrict. Furthermore, this authority is inherent in the general power to reapportion the legislature. Redistricting is inseparable from reapportionment and the Governor should be able to authorize any constitutional device to accomplish the task. The Oregon Supreme Court in its recent review of that state's reapportionment set forth the applicable principles as follows:

> Apportionment is accomplished by changing legislative district lines and an integral part of apportionment is making a choice between fixing legislative district lines along a single-member district plan or a multi-member district plan. This is a decision that the legislature would have had to make if it had done the reapportioning. It must be made by the Secretary of State or whatever body makes the apportionment.[46]

■ Where the method or motive of districting rather than the mathematical precision of the apportionment is being challenged, the Supreme Court of the United States has consistently required that the challenger bear the burden of proving unconstitutionality.[47] The plaintiffs below failed to meet this burden of proof and we hold that the creation of single-member districts from multi-member districts was within the powers available to the Governor.

## V. DESIGNATION OF SEATS WITHIN MULTI-MEMBER DISTRICTS

The 1971 plan provided that each seat within the multi-member districts of Anchorage and Fairbanks should be designated alphabetically, and that each candidate for office within that district should indicate at the time of filing the particular lettered seat for which he seeks election. The plaintiffs challenged the authority of the Governor to designate seats within multi-member districts.

■ The Governor's general power to reapportion includes the right to utilize the tool of designated seats. The reasoning set forth in Hovet v. Myers,[48] gives support to this position. An identical problem arose in the case of Moss v. Burkhart,[49] wherein the court in redistricting the Oklahoma legislature authorized designated seats. If a court has such power under its general authority to reapportion, a Governor authorized specifically by a state constitution to reapportion should be held to have similar power.

## VI. TERMINATING LEGISLATORS' TERMS

■ The 1971 Reapportionment Plan provided for termination of all Senators' terms, with the exception of two Senators whose districts were not altered. Under the 1971 plan the areas to be represented by the remaining Senators were changed, and particularly the Anchorage senatorial districts had drastic changes in that the Senators no longer were to run at large. A need to truncate the terms of incumbents may arise when reapportionment

---

45. Alaska Const. art. VI, § 6.

46. Hovet v. Myers, 489 P.2d 684, 689 (Or.1971).

47. E. g., Whitcomb v. Chavis, 403 U.S. 124, 144, 91 S.Ct. 1858, 29 L.Ed.2d 363, 376 (1971). Cf. Kilgarlin v. Hill, 386

U.S. 120, 121, 87 S.Ct. 820, 17 L.Ed. 2d 771, 774 (1967).

48. 489 P.2d 684, 689 (Or.1971).

49. 220 F.Supp. 149, 158 (W.D.Okl.1963), aff'd sub nom., Williams v. Moss, 378 U.S. 558, 84 S.Ct. 1907, 12 L.Ed.2d 1026 (1964).

results in a permanent change in district lines which either excludes substantial numbers of constituents previously represented by the incumbent or includes numerous other voters who did not have a voice in the selection of that incumbent. The discretionary authority to require mid-term elections when necessary is well established.[50] We accordingly hold that the Governor had the power to terminate Senate terms as incidental to his general reapportionment powers.[51]

## VII. GOVERNOR'S AUTHORITY TO REAPPORTION

The Governor's authority to reapportion the Senate was also challenged by the plaintiffs below. In Wade v. Nolan this question was discussed in detail, and we concluded that under the Alaska Constitution the Governor with the assistance of the reapportionment board had the implied power to reapportion the Senate on an interim basis.[52] Since there has been no amendment to the constitution, our decision on that point remains unaltered.

Plaintiffs below indicated that the legislature was prepared to initiate a constitutional amendment pertaining to reapportionment. Since the constitution does not specifically provide for Senate reapportionment and impermissibly limits the reapportionment base to civilian population, we

strongly urge that an appropriate amendment to the constitution be prepared and presented to the electorate.

The decision of the superior court is affirmed in part and reversed in part in accordance with the provisions of this opinion. The case is remanded to the superior court for the purpose of referring the matter of a permanent reapportionment plan to the Governor with the assistance of an advisory board to be appointed by him in accordance with the provisions of the Alaska Constitution.

## APPENDIX I

1. Decision and Order of May 26, 1972.

2. Reference to Masters, May 26, 1972.

3. Masters' Report.

4. Order Establishing an Interim Reapportionment Plan.

5. Order Denying Objections to Interim Reapportionment Plan.

## DECISION AND ORDER

This matter was heard by the court on May 24, 1972, upon petition for review and cross-petition for review. The court recognizes the extreme difficulty of the task confronted by the Governor and the Reapportionment Board in reapportioning the

---

50. Mann v. Davis, 238 F.Supp. 458 (E.D. Va.1964), aff'd, 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698 (1965); Moss v. Burkhart, 220 F.Supp. 149, 157 (W.D. Okl.1963), aff'd sub nom., Williams v. Moss, 378 U.S. 558, 84 S.Ct. 1907, 12 L.Ed.2d 1026 (1964); Sims v. Amos, 336 F.Supp. 924, 940 (M.D.Ala.1972); Butcher v. Bloom, 420 Pa. 305, 216 A.2d 457, 459 (1966).

51. In the interim plan promulgated by this court, Senate terms of incumbent Senators were not terminated. The interim plan did not contain the drastic reapportionment of the Anchorage Senatorial districts. We felt that it was preferable not to shorten the terms of Senators, particularly as this may become a necessity upon the formulation of a permanent plan. The additions or substitutions of

geographical areas under the interim plan have not so materially changed the population base which elected each of the Senators as to prevent him from adequately representing his designated district. There is ample authority for permitting Senators to serve out their terms *under an interim plan* even when the boundaries of their districts have been changed. Mann v. Davis, 238 F.Supp. 458 (E.D.Va.1964), aff'd, 379 U.S. 694, 85 S.Ct. 713, 13 L.Ed.2d 698 (1965); Moss v. Burkhart, 220 F.Supp. 149, 158 (W.D. Okl.1963), aff'd sub nom., Williams v. Moss, 378 U.S. 558, 84 S.Ct. 1907, 12 L. Ed.2d 1026 (1964); Sims v. Amos, 336 F.Supp. 924, 940 (M.D.Ala.1972); Butcher v. Bloom, 420 Pa. 305, 216 A.2d 457, 459 (1966).

52. 414 P.2d 689, 700 (Alaska 1966).

State of Alaska because of its differing climates, topography, ethnic composition, socio-economic interests and distribution of its relatively sparce population. However, under the mandate of various decisions of the United States Supreme Court, we make the following determinations and order:

1. The reapportionment plan proposed by the Governor of Alaska in his Proclamation of Reapportionment and Redistricting of December 30, 1971, is unconstitutional in that its overall reapportionment of the Senate and House of Representatives results in proposed election districts that do not contain as nearly equal population proportions as is practicable. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed. 2d 506 (1964); Wade v. Nolan, 414 P.2d 689 (Alaska 1966). Under the Equal Protection and Supremacy Clause of the Constitution of the United States of America, the constitutional right to vote of every citizen of Alaska is protected against impermissible dilutions and impairments flowing from malapportionment of either the House of Representatives or the Senate. In order to effectuate this constitutionally protected right to vote, we are obliged to declare the reapportionment plan of December 30, 1971, invalid under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2. To insure compliance with the Equal Protection Clause in regard to the forthcoming 1972 primary and general elections for the State Legislature this court must formulate an interim reapportionment and redistricting plan. Scott v. Germano, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 675–676, 84 S.Ct. 1429, 12 L.Ed.2d 595, 607 (1964). The Lieutenant Governor is to conduct the 1972 primary and general elections for the State Legislature pursuant to the interim reapportionment and redistricting plan which this court will adopt.

3. In order to fashion an interim plan this court will appoint one or more masters to assist it.

4. Upon receipt of the report of the master or masters, this court will consider the manner in which the House and Senate districts shall be reapportioned. This court will then proceed to adopt an interim plan of reapportionment which, as nearly as practicable, considering the allotted time, reflects the standards which have been made binding upon the states by the United States Supreme Court. Ely v. Klahr, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971); Reynolds v. Sims, 377 U.S. 533, 586, 84 S.Ct. 1362, 12 L.Ed.2d 506, 541 (1964).

5. In the event this court determines that the exigencies of the situation preclude the fashioning of an interim constitutional reapportionment plan by June 15, 1972, this court will enter a further order specifying the plan under which the Lieutenant Governor shall conduct the 1972 primary and general elections for the State Legislature, together with the dates that such elections will be held. Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

6. A full opinion discussing and determining the issues which were raised in the petition and cross-petition will be filed in due course.

Dated at Juneau, Alaska, this 26th day of May, 1972.

George F. Boney

Chief Justice
Jay A. Rabinowitz

Associate Justice
Roger G. Connor

Associate Justice
Robert C. Erwin

Associate Justice
Robert Boochever

Associate Justice

Supreme Court

State of Alaska

May 26, 1972

CHIEF JUSTICE
   GEORGE F BONEY

ASSOCIATE JUSTICES
   JAY A. RABINOWITZ
   ROGER G. CONNOR
   ROBERT C ERWIN
   ROBERT BOOCHEVER

POUCH U, CAPITOL BUILDING
JUNEAU, ALASKA
99801

PERSONAL & CONFIDENTIAL

Dr. George W. Rogers
1790 Evergreen Avenue
Juneau, Alaska 99801

Dear Dr. Rogers:

Pursuant to your appointment by the Supreme Court of the State of Alaska as a special Master in the case of William A. Egan, et al v. Jay S. Hammond, et al, File No. 1711, you are hereby given the following instructions:

1. By use of the official Census of 1970, you should establish a population base for the State of Alaska. This population base should include military personnel who were enumerated in the 1970 Census.

2. You should make an inquiry to determine whether or not the number of nonresident military personnel included in the 1970 Census can be determined. If a determination can be made, then you should subtract the number from the total which you have arrived at in paragraph 1 above. You should also state the methods in detail by which you arrived at this determination.

3. Once you have determined the population base, you should divide the same by 40. This will give you the ideal number of persons to be included in a single member House district. You should then divide the population base by 20 which will represent the ideal population for a single member Senate district.

4. You should then establish House and Senate election districts containing a number of persons as close to the formula as feasible.
[A6694]

5. In establishing House and Senate districts, an effort should be made to make the districts correspond, where feasible, with the approximate boundaries set out in the 1971 reapportionment plan. No designated seats will be established within a multi-member district if multi-member districts are established. In establishing House and Senate districts you should, wherever feasible, create a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.

6. If there are any substantial deviations from the population norms, express, specific reasons should be set forth.

This letter should be treated as a confidential, internal memorandum of the Supreme Court and should not be made public without the approval of the Supreme Court.

Very truly yours,

George F. Boney
Chief Justice

(Note: Identical letter sent May 26, 1972 to
Mr. William H. Scott
736 G Street
Anchorage, Alaska 99501.)

[A6695]

## REPORT OF THE MASTERS OF THE SUPREME COURT OF THE STATE OF ALASKA

### TABLE OF CONTENTS

I. Masters' Proposed Interim Plan .......... 879

  a. Summary Evaluation of Proposed Plan .. 881

II. Establishment of the Population Base ...... 882

  a. Statistical Sources for Calculation of 1970 Population Base .............. 882

  b. Determination of Resident Characteristics of Military Personnel .............. 884

  c. Definition of Residency ............. 884

  d. Trends in Level and Distribution of Military Personnel ................... 884

  e. Tour of Duty and Mobility Characteristics of Military ...................... 885

  f. Voting Behavior and Other Characteristics of Military ...................... 887

  g. Effects of Total and Partial Exclusion of Military from the Population Base .. 887

  h. Conclusions ...................... 888

III. Establishment of District ................ 888

  a. Alaska's Regional History ........... 889

  b. General Evaluation of Districting ..... 891

  c. Establishing the Districts ........... 892

  House District 1.   Ketchikan ....... 892

  Senate District A.   Ketchikan ....... 892

  House District 2.   Prince of Wales-Petersburg-Wrangell-Angoon ........ 892

  House District 3.   Sitka ........... 892

  Senate District B.   Alexander-Archipelago ...................... 893

  House District 4.   Juneau ........ 893

  Senate District C.   Juneau ........ 893

  House District 5.   Prince William Sound ...................... 893

  House District 6.   Matanuska-Susitna 894

  Senate District D.   Prince William Sound-Matanuska-Susitna ......... 894

  House Districts 7–10. Anchorage ....... 894

  Senate District E.   Anchorage ....... 894

  House District 11.   Cook Inlet ...... 894

  Senate District F.   Cook Inlet ...... 895

  House District 12.   Kodiak-Central ... 895

  House District 13.   Aleutian Islands-Western Gulf of Alaska .......... 895

  Senate District G.   Kodiak-Aleutians .. 895

  House District 14.   Bristol Bay ...... 895

  House District 15.   Bethel ......... 895

  Senate District H.   Bristol Bay-Bethel 895

  House District 16.   Yukon-Koyukuk-Kuskokwim ................... 895

  House District 18.   Nenana-Mount McKinley ...................... 896

  Senate District I.   Interior Alaska ... 896

  House District 17.   Fairbanks ....... 896

  Senate District J.   Fairbanks ....... 896

  House District 19.   North Slope ..... 896

  House District 20.   Bering Strait-Norton Sound ................... 897

  Senate District K.   North Slope-Bering Strait .................. 897

Bibliography ............................. 897

## REPORT OF THE MASTERS OF THE SUPREME COURT OF THE STATE OF ALASKA

In order to assist in fashioning an interim reapportionment plan, the Supreme Court of the State of Alaska on May 26, 1972 appointed George W. Rogers, of Juneau, Alaska, and William H. Scott, of Anchorage, Alaska, as special Masters to the Court. Instructions were issued by the Court to both Masters establishing standards and providing guidelines to be followed in the discharge of their assignment. The Masters had the legal and editorial assistance of R. E. Hicks, a law clerk of the Supreme Court, the statistical and cartographic services of Richard Listowski, a research analyst, and the clerical and stenographic services of Mary Eldemar. Work was commenced immediately upon appointment of the Masters.

The proposed interim plan submitted with this report is in accord with the Court's specific standards for a reapportionment plan. Arithmetical deviations from the population ideal or "norm" were reduced to the minimum feasible given the unique characteristics of Alaska's geography, population distribution and socio-economic development. At the same time, the Masters believe that the plan contains no discrimination, by design or oversight, against any political party, geographic region, urban or rural interests or racial or ethnic group.

In addition to presenting the outline of the proposed plan for reapportionment of the House and Senate and an evaluation of its features as compared with the other alternative plans before the Court, the Masters recognized an obligation to set forth for the benefit of the Court and the public the considerations which guided their decisions. These are presented in detail with supporting statistical evidence, analysis and reference bibliography. This portion of the report has been organized into two main parts presenting considerations and data which went into the establishment of (1) the population base and (2) the districts.

## I

## MASTERS' PROPOSED INTERIM REAPPORTIONMENT PLAN

On May 26, 1972 the Masters were presented with the following instructions to be followed in fashioning an interim plan for the Court's consideration:

1. By use of the official Census of 1970, you should establish a population base for the State of Alaska. This population base should include military personnel who were enumerated in the 1970 Census.

2. You should make an inquiry to determine whether or not the number of nonresident military personnel included in the 1970 Census can be determined. If a determination can be made, then you should subtract the number from the total which you have arrived at in paragraph 1 above. You should also state the methods in detail by which you arrived at this determination.

3. Once you have determined the population base, you should divide the same by 40. This will give you the ideal number of persons to be included in a single member House district. You should then divide the population base by 20 which will represent the ideal population for a single member Senate district.

4. You should then establish House and Senate election districts containing a number of persons as close to the formula as feasible.

5. In establishing House and Senate districts, an effort should be made to make the districts correspond, where feasible, with the approximate boundaries set out in the 1971 reapportionment plan. No designated seats will be established within a multi-member district if multi-member districts are established. In establishing House and Senate districts you should, wherever feasible, create a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socioeconomic area.

6. If there are any substantial deviations from the population norms, express, specific reasons should be set forth.

In accordance with these instructions the Masters on June 12, 1972 submitted a preliminary version of a proposed reapportionment plan. The plan and supporting report were reviewed with the Court and a revised proposed plan prepared incorporating changes suggested by the Court. The changes are reflected in Tables A and B.

<u>TABLE A</u>

POPULATION - REPRESENTATION CHARACTERISTICS
OF HOUSE DISTRICTS
MASTERS' PROPOSED INTERIM PLAN

| House District Number | House District Name | 1970 Census Population | No. of Seats | % Variation From Norm |
|---|---|---|---|---|
| | $\frac{302,361}{40}$ = 7,559 population norm per Representative | | | |
| 1. | Ketchikan | 11,717 | 2 | -22.5 |
| 2. | Prince of Wales-Petersburg-Wrangell | 7,522 | 1 | - 0.5 |
| 3. | Sitka | 7,558 | 1 | 0.0 |
| 4. | Juneau-Lynn Canal | 15,768 | 2 | + 4.3 |
| 5. | Prince William Sound | 7,435 | 1 | - 1.6 |
| 6. | Matanuska-Susitna | 7,670 | 1 | + 1.5 |
| 7. | Anchorage, Northwest | 38,818 | 5 | + 2.7 |
| 8. | Anchorage, Spenard | 23,102 | 3 | + 2.1 |
| 9. | Anchorage, Northeast | 38,595 | 5 | + 2.1 |
| 10. | Anchorage, South | 23,310 | 3 | + 2.8 |
| 11. | Cook Inlet | 14,770 | 2 | - 2.3 |
| 12. | Kodiak (Urban) | 7,568 | 1 | + 0.1 |
| 13. | Western Gulf of Alaska-Aleutian Islands | 7,352 | 1 | - 2.7 |
| 14. | Bristol Bay | 7,361 | 1 | - 2.6 |
| 15. | Bethel | 7,671 | 1 | + 1.5 |
| 16. | Yukon-Koyukuk-Kuskokwim | 7,635 | 1 | + 1.0 |
| 17. | Fairbanks | 45,664 | 6 | + 0.7 |
| 18. | Nenana-McKinley | 7,419 | 1 | - 1.9 |
| 19. | North Slope | 7,766 | 1 | + 1.3 |
| 20. | Bering Straits | 7,660 | 1 | + 1.3 |
| | | 302,361 | 40 | |

[A6696]

TABLE B

POPULATION - REPRESENTATION CHARACTERISTICS
OF SENATE DISTRICTS
MASTERS' PROPOSED INTERIM PLAN

| Senate District Number | Senate District Name | 1970 Census Population | No. of Seats | % Variation From Norm |
|---|---|---|---|---|
| | $\frac{302,361}{20}$ = 15,118 population norm per Senator | | | |
| A. | Ketchikan | 11,717 | 1 | -22.5 |
| B. | Alexander Archipelago-East Gulf of Alaska | 15,080 | 1 | - 0.3 |
| C. | Juneau-Lynn Canal | 15,768 | 1 | + 4.3 |
| D. | Prince William Sound-Matanuska-Susitna | 15,105 | 1 | - 0.1 |
| E. | Anchorage | 123,825 | 8 | - 0.1 |
| F. | Cook Inlet | 14,770 | 1 | - 2.3 |
| G. | Kodiak-Aleutians | 14,920 | 1 | - 1.3 |
| H. | Bristol Bay-Bethel | 15,032 | 1 | - 0.6 |
| I. | Interior Alaska | 15,054 | 1 | - 0.4 |
| J. | Fairbanks | 45,664 | 3 | + 0.7 |
| K. | North Slope-Bering Strait | 15,426 | 1 | + 2.0 |
| | | 302,361 | 20 | |

a. Summary Evaluation of Proposed Plan

It is our belief that this plan not only is in accord with the instructions received, but that it provides decided improvements over both the 1965 reapportionment and the 1971 reapportionment. The following comparisons are offered for the Court's consideration:

| I. ELECTORAL PERCENTAGES [1] | House | Senate |
|---|---|---|
| 1965 Plan | 42.66% | 46.52% |
| 1971 Plan | 48.71% | 51.25% |
| 1971 Plan Plus Military | 44.87% | 54.35% |
| Masters' Plan | 51.26% | 53.83% |

| II. POPULATION VARIANCE RATIOS [2] | | |
|---|---|---|
| 1965 Plan | 3.79 to 1 | 1.66 to 1 |
| 1971 Plan | 2.28 to 1 | 1.52 to 1 |
| 1971 Plan Plus Military | 3.34 to 1 | 1.88 to 1 |
| Masters' Plan | 1.35 to 1 | 1.35 to 1 |

| III. RANGE OF VARIATION | Percent | Percent |
|---|---|---|
| 1965 Plan | +104.57 to -45.95 | -26.19 to -23.72 |
| 1971 Plan | + 23.35 to -45.93 | +26.14 to -17.22 |
| 1971 Plan Plus Military | + 61.9 to -51.6 | +43.2 to -23.8 |
| Masters' Plan | + 4.3 to -22.5 | + 4.3 to -22.5 |

1. Minimum population represented by a bare majority of the legislature.

2. Comparison of the populations in the largest district and in the smallest district.

[A6697]

The House districts established by the proposed plan preserve the identity of recognized regional entities and local natural and socio-economic units. Illogical combinations in creating Senate districts are also avoided. This is an important improvement over existing plans.

## II

## ESTABLISHMENT OF THE POPULATION BASE

### a. *Statistical Sources for Calculation of 1970 Population Base*

Article VI, section 3 of the Alaska Constitution requires that the population base for purposes of reapportionment be "the civilian population *as reported by the United States Census.*" (Emphasis added.) The first instruction from the Court is that a population base be established "by use of the *official Census of 1970*" and that the base "should include military personnel *who were enumerated in the 1970 Census.*" (Emphasis added.) As a preliminary to fashioning an interim reapportionment plan, therefore, it was necessary to examine and evaluate all of the available 1970 Census reports and to review the procedures by which the 1971 Reapportionment Advisory Board (hereinafter "the Board") arrived at its population base for the 1971 reapportionment plan. The comments which follow are not intended to be critical of the Board, which was confronted with an immensely difficult task to perform without the guidance of the specific instructions provided to the Masters by the Court. The plan prepared by the Board significantly improved former variances from the population norm.

The results are compared in Table 1. The differences in the two sets of statistics (the Census and the Board's counts) are in the number of members of the Armed Forces. A comparison of the list of members of the Armed Forces by areas as reported by the Census and the list used by the Board indicates that although the state totals differ only slightly, the local differences are substantial in the Anchorage and Fairbanks areas. The use of the Board's statistics on military personnel, therefore, results in a civilian population which varies significantly from the official Census enumeration of civilian population by districts.

Table 2 compares the Census and the Board's listings of members of the Armed Forces by Census divisions and places. Differences were due to definition, data collection procedures and the basic nature and purpose of each series.

The Census definition of members of the Armed Forces is "persons on active duty with the United States Army, Air Force, Navy, Marine Corps or Coast Guard".[3] These were enumerated at their "usual place of residence" and the totals were reported for the state, the Census divisions, and a number of more specific locations. The definition and enumeration procedures have not changed since the 1950 Census.

The Board did not use the official Census count of the Armed Forces, however, having decided that "except in time of national emergency, the Coast Guard operates under the auspices of the Department of Transportation".[4] A breakdown of the military population by branch of service is not available from published Census sources or from the summary computer tapes. Obtaining this data would require an expensive and time consuming resort to the original, individual questionnaire forms. Presumably for this reason, the Board secured from the Alaska Command a list of the number and location of uniformed military personnel within the state as of April 1, 1970, to be used in arriving at its "civilian population." Uniformed Coast Guard personnel (included in the Census definition of Armed Forces) and all dependents of military personnel, were included in the "civilian" population base.

3. Report PC(1)–C3, Alaska, App. 15–16.

4. Report of the Governor's Advisory Reapportionment Board, p. 1.

Other differences arise because of the data collection procedures in each case. The Alaska Command figures were tabulated from the staffing records for all defense bases, installations and stations within Alaska as of April 1, 1970. The Census figures were from tabulations of data collected by questionnaires through a combined method of self-enumeration and interviews by enumerators. Census data on employment status (including both civilian work force and members of the Armed Forces) "refer to the calendar week prior to the date on which respondents completed their questionnaires or were interviewed by enumerators. Since the week of enumeration was not the same for all persons, the reference week for employment data is not entirely uniform. For many persons, the reference week for answering the 1970 Census employment status question was the last week in March." [5]

Definitions, collection procedures and reference dates account for most of the differences in *numbers*, but locational differences reflect more basic and important differences in the nature of the two sources. Since 1790 the primary objective of the decennial census enumerations has been to count every inhabitant of the Nation at the place where he "lives and sleeps most of the time." The Census notes that "this place is not necessarily the same as his legal residence, voting residence, or domicile," and the inclusion of the criteria regarding where he "lives and sleeps" indicates that residence is not necessarily related to the place of employment.[6] ("Place of work" is separately identified and used in the Census analysis of commuters' patterns.)

The nature of "residence" is made quite specific for the Armed Forces. "Members of the Armed Forces *living* on military installations were counted as residents of the area in which the installation was located. Members of the Armed Forces *not living* on military installations were counted as residents of the area in which they *were living*." Dependents were counted "where they *were living* on census day (e. g., the military installation, 'off base,' or elsewhere, as the case might be)." [7] (Emphasis added.)

The Alaska Command data, on the other hand, allocates the subject population by location of *duty* assignment. As the Census definitions made clear, this is not necessarily where the individual was living. The differences in the nature of the two sets of statistics are most clearly illustrated by comparisons within the three major military areas of the state. (Table 2) While total differences are perhaps slight, the allocations between on-base and off-base personnel differ drastically. This is simply because one set of data (Census) reports "place of residence" of members of the Armed Forces, and the other set (Alaska Command) reports the "place of work." If voting is to be relative to place of residence, the use of statistical data based on "place of work" can significantly distort the computed reapportionment population base.

The use of Alaska Command data in connection with Census data in arriving at a civilian population base differs from this Court's instruction that military personnel be those "who were enumerated in the 1970 Census." Furthermore, a combined use of Alaska Command data and Census data is not sound statistical practice because of the basic differences in the nature of the data and in the primary purposes served by each set of statistics. Although the differences might be considered minor for state totals or even for Census divisions, the difference within particular divisions could result in significant distortion of the reapportionment population base. This is apparent from a comparison of the data for the larger military districts in Table 2.

If the Board believed that it was necessary to adjust the Census definition and count of members of the Armed Forces to retain Coast Guard personnel and in the

5. Census Report PC(1)–C3, Alaska, App. 15.

6. *Id.*, p. III.

7. *Id.*, p. IV.

"civilian" population, the amount of distortion could have been minimized by requesting the staffing data from the Department of Transportation rather than from the Department of Defense. For present purposes, however, it appears more defensible to retain the Census definition and data. Although the Coast Guard personnel are under the Department of Transportation and not the Department of Defense, they automatically come under a unified defense command in times of national emergency. Furthermore, the organization, operations, personnel rotation policies and general relations of Coast Guard personnel to other persons in Alaska communities are comparable to those of the Department of Defense. Finally, the Census definition of Armed Forces is used in other programs (such as the allocation of federal grants to states on a basis of population, etc.) and is used in the Alaska Department of Labor's annual population estimates.

Table 3 summarizes the 1970 total (Armed Forces and civilian) population data by the Census divisions. These divisions have been grouped to approximate the House districts given in the 1971 reapportionment report and are used in this study in analyzing the 1971 plan.

b. *Determination of Resident Characteristics of Military Personnel*

The second instruction from the Court is that the Masters should inquire "whether or not the number of *nonresident* military personnel included in the 1970 Census can be determined." (Emphasis added.) A conscientious and protracted effort was made to arrive at such a determination from the official census data and other appropriate sources. This investigation started with a consideration of the various definitions of residence; a study of the trends and the position of the military as a whole in the population and economy of Alaska over the past three decades: an inquiry into the length of tour-of-duty and the mobility characteristics of the military population in Alaska; and finally a comparison of military and civilian voting behavior. The

investigation concluded with an analysis and evaluation of the effects of three different population bases (civilian population, civilian plus part of the military, and total population) upon the district representation patterns under the 1971 reapportionment plan.

c. *Definition of Residency*

The attempt to define nonresident military necessarily begins with a discussion of what is meant by "residence". In its strictest legal sense, residence usually requires living in the state for a minimal period of time, generally one year. Then again, residence is sometimes confused with the quite different legal concept of domicile. Still another—and perhaps the laymen's concept of residence—is defined with emphasis on the intent of the person to remain on a more or less permanent basis in the state. On the other hand, the Census use of the term "residence" is defined in terms of habitation or where the person lives most of the time. Finally, for purposes of voting, residency might be defined as the durational requirement to register, which, in Alaska, is presently 75 days.

Although various concepts of residency were explored, we have ultimately chosen the strictest legal definition, assuming that if the justices (as lawyers) had wanted us to consider domicile, Census habitation, laymen's "intent" or durational registration requirements, the instructions would have so specified.

But even the legal definition of residence might differ depending upon the purpose of the requirement (e. g., licenses, taxing, welfare or divorces). Thus we have made a general assumption that residency for present purposes would minimally require that the party have lived in the state for at least one year, and we have explored the impact and consequences of including military personnel with various tours of duty in Alaska.

d. *Trends in Level and Distribution of Military Personnel*

Prior to the onset of World War II, the presence of the military in Alaska was lim-

ited to about 500 uniformed personnel scattered across the territory, engaged in maintaining an essentially civilian communications system and manning Fort Seward (the present day Port Chilkoot) to defend the United States boundary against possible military contest from Canada. Since World War II the military has been a dominant element in the Alaska economy and population. Only in the past decade did it decline both in absolute terms and relative to the total population.

Table 4 summarizes the number of military personnel (Department of Defense and Coast Guard) reported by the United States Census in Alaska as of July 1 of each year from 1950–70. Immediately after the end of hostilities in World War II there was an out-movement of troops resulting in a drop from the 1943 high of 152,000 to a 1946 low of 19,000. The Cold War and Korean War resulted in an immediate reversal of this trend in 1947 building up annually to a new peak of 50,000 in 1952 which was maintained for six years. A short drop occurred in 1958 to the levels which have been maintained throughout the 1970's with only minor variations.

Table 5 compares the geographic distribution of military personnel in the 1950, 1960 and 1970 Census reports. The locational patterns over these two decades have been remarkably constant with the major concentrations in four centers together accounting for 91.2% of total military population in 1950, 87.1% in 1960 and 89.0% in 1970. Annual data for the decade of the 1960's by Census district further emphasize the stability of both the locational patterns and the levels of this population (Table 6).

Directly associated with these uniformed personnel and sharing similar resident-nonresident characteristics are the civilian employees of the Department of Defense and the Coast Guard (averaging slightly more than 6,500 annually during the 1960's according to Alaska Department of Labor records), and the dependents of both groups (ranging from 40,600 in 1964 to 33,000 in 1970, according to Alaska Command records). Finally, a major part of construction and support service employment can be directly attributed to the military presence in Alaska. In spite of recent expansion of natural resource based industries, defense is still the most important part of Alaska's basic economy and is still its largest "industry."

The data summarized in Tables 4, 5 and 6 clearly demonstrate that military personnel in Alaska have been a significant and relatively stable element in the total population. The defense establishment has and continues to constitute Alaska's single most important economic element. Directly and indirectly associated with the uniformed personnel are a further significant group of civilians whose continuation as residents of Alaska is dependent upon the continued presence of the military personnel.

e. *Tour of Duty and Mobility Characteristics of Military*

According to Census definitions, everybody enumerated in Alaska as of April 1, 1970 is a "resident" of the state and the place they were living and sleeping "most of the time." Any numerical adjustment of the military figure would have to be justified on a modification of the Census definition of resident which included a time dimension. The Census reports provided indicators of the length of tour-of-duty of military personnel at different locations and different housing facilities, and relative mobility of military personnel compared with other Alaskans.

The length of the tour of individual members of the Armed Forces is determined by official policy. Rotation policy is summarized by an officer of the Alaska Command in a review of the Department of Defense activities in Alaska in 1970 as follows:

The number of military personnel and dependents changes in response to external forces (national political consideration, changes in international situation, defense technology, etc.), yet personal characteristics of the group remain relatively static, being determined by a selec-

tive and stable range of age, sex, and occupation patterns because of the practice of rotating personnel and dependents on a tour-of-duty basis. *These tours are typically 35 months for personnel accompanied by their families in the Anchorage and Fairbanks areas, and 24 and 18 months respectively for unaccompanied personnel.* Few curtailments are given, but many extensions are approved. *The normal tour length for isolated installations is one year.* Dependents are not allowed at isolated posts. [Emphasis added] [8]

The members of the Armed Forces accompanied by families and having 35 month tours-of-duty would appear to qualify as potential resident Alaskans. Furthermore, the civilian dependents accompanying these personnel and sharing their residency characteristics are included in the "civilian" population base. The Census would list these dependents of military personnel as "members of households."

The remaining unaccompanied military personnel have shorter tours at Anchorage (24 months), Fairbanks (18 months) and isolated installations (12 months). These are listed by the Census as living in "other group quarters".[9] Table 7 classifies members of the Armed Forces in 1970 by type of living quarters and by Census divisions and selected places. In combination with the above quoted summary of tour-of-duty policy, this tabulation would suggest that the *maximum* number of military who might be considered as nonresidents (on the basis of a strict time dimension) would be the 51.9% living in military barracks or on ships. This would be on the basis of a very loose definition of "resident," and could clearly be challenged on more technical grounds.

Another indicator of resident-orientation is found in Census statistics on population mobility. This is measured in terms of relative magnitude of the movement of the April 1, 1970 population five years of age and over from the place they resided in on April 1, 1965 (the same house, different house, different county in the same state, outside the state). The Census definition of "migrant" is a person who had a 1965 residence in a different county of the same state or a different state from which they resided on April 1, 1970.[10] This data is available for the population on the major military bases in Alaska and for the Census divisions. Table 8 summarizes for five bases for which data are published as related to all persons five years of age and older, with the comparable data for all other persons residing in the Census divisions in which the bases are located. This indicates that population on these bases was from two to three times as mobile as the remaining population of the Census divisions in which they are located, but it also indicates that between 25–30% of the population on these military bases have resided in Alaska for more than five years. The conclusions to be drawn are that all Alaskans exhibit a high degree of mobility, that members of the Armed Forces are more mobile than other Alaskans, but that also a significant proportion of members of the Armed Forces are relatively long-term residents of the State.

The two sets of Census data analyzed indicate that on a tour-of-duty basis, approximately half the military population probably would be or had been *short-term residents* (for less than 24 months in Anchorage, 18 months in Fairbanks and 12 months in the Aleutians and elsewhere). On the other hand, according to mobility data, between 20–30% were *long-term residents* (five years or more). This would leave about 20% as *intermediate-term residents* (between two to four years). It is

8. Brent R. Bowen, "Defense Spending in Alaska," Alaska Review of Business and Economic Conditions, Vol. VIII, No. 1, July 1971, pp. 5–6.

9. "These include persons residing in military barracks, on ships, in college dormitories, . . . . ." Census Report PC(1)–C3, Alaska, p. IV.

10. United States Bureau of the Census, Report PC(1)–C3, Alaska p. App. 8.

only within the group of short-term residents that any supportable nonresident group could be defined without more information about the subjective intent of members to take affirmative action to claim residency. Therefore, nonresident military will probably be something *less than* half the total.

f. *Voting Behavior and Other Characteristics of Military*

A further indicator of resident characteristics of the military population would be registration to vote and actual voting records. Direct and complete data are not available, but a comparison of the voting record of the population (military *and* civilian) on the major defense bases with the remainder of Alaskans can be made. Table 9 indicates a very low voting percentage among persons on these bases as compared with the remainder of the state population. No means are available for segregating these statistics further on a military-civilian basis or of discovering similar indirect or direct measurements for off-base military election participation. One might surmise that military personnel in private dwellings off-base would have greater incentive to participate in local elections because of property taxation, local school policies, etc. However, there is no way to "break out" the vote; there are no voting records of military personnel living off-base. The limited information available would seem to reinforce the popular impression that for a variety of reasons (protection of voting rights elsewhere, briefness of Alaska residence, apathy, taxation, etc.) the on-base military generally do not participate in state or local elections.

One of the Masters met with Col. Roger Koltz, Personnel Officer for the Alaska Command at Elmendorf Air Force Base. Col. Koltz advised that records of the Air Force and Army reflect that present "Alaska residents" of those two services numbered 125 and 65 respectively. Residence of record for this purpose is commonly established by members of the military for various reasons (tax and estate status, absentee voting rights, travel allowances, etc.). These figures, however, do not necessarily represent the type of "residence" contemplated by the Court's instructions. They do not include Navy and Coast Guard "residents." Moreover, the latter are a potentially significant number because the policy of the Coast Guard is to encourage community participation. Finally, even the incomplete figures published for the Alaska general election of November 3, 1970 indicate that, in fact, more military personnel voted than claimed "residence of record" with the Alaska Command. (See Table 9) To be sure, voter registration data must be distinguished from residency data. But voter registration is still another index of permanency in Alaska, and as such, the data indicates that the "residency of record" figure used by the military is misleading as representing the number of military personnel who *would* actually claim legal residency.

g. *Effects of Total and Partial Exclusion of Military from Population Base*

From the examination of all relevant data available it appears that a supportable case cannot be made for excluding *all* military, although some basis may be uncovered for excluding a portion of the military. Consideration was given to taking a poll or a sample of military personnel in Alaska in order to arrive at a more precise determination of residency than the generalized suggestion that unaccompanied personnel living in barracks or on ship (51.9% of total members of Armed Forces) be considered as the maximum number of nonresidents. This was not executed because of the time difficulty of conducting a poll, and because it would be taken more than two years after the Census enumeration and thus would be a sampling of a different set of people with possibly changed attitudes.

Finally, and most decisively, an analysis of the 1971 reapportionment plan using three different population bases (total population, total population less members of

the Armed Forces in barracks and on ships, and civilian population) demonstrates that the effect of changes in the base upon district representation in the House would be so insignificant as to render such an undertaking purely academic.

Table 10 lists the total population, the total population less military personnel in group quarters (51.9% of members of the Armed Forces) and civilian population (excluding *all* members of the Armed Forces) by the reapportionment districts of this 1971 plan, and compares the results of dividing each base by the ideal or "norm" for equal representation. Adding the members of the Armed Forces in households (not in group quarters) to the civilian population results in raising the population-representative ratio for the Fairbanks district from 5.488 to 5.642, or rounded to whole numbers, technically an increase from 5 to 6 representatives. *No other district-representation is altered by the addition of this portion of the Armed Forces.*

Adding back *all* members of the Armed Forces and using the *total* April 1970 population as the base results in the loss of the representative in the Lynn Canal-Icy Straits district (but a mere decrease in the population-representative ratio from 0.508 to 0.484), and the addition of one representative in the Aleutian-Bristol Bay district (from 1.188 to 1.619).

With each of these three different population bases, some adjustments in district boundaries would obviously be required in order to bring the total of the rounded figure to 40 House seats. For example, the addition of only 119 persons to Lynn Canal-Icy Straits would restore its one representative and the subtraction of 900 persons from the Aleutian-Bristol Bay would reduce its representation by one.

h. *Conclusion*

The conclusions drawn from this analysis are (i) that a determination of residency other than that used by the Census is a highly subjective and arbitrary process, and (ii) that changes in the population base from civilian to total would, in any case,

result in virtually no change in district representation.

## III. ESTABLISHMENT OF DISTRICTS

The remaining instructions of the Court relate to the guides and standards to be used in establishment of the new House and Senate election districts. These were as follows:

(1) That the "ideal number of persons to be included in a single member House district" is to be determined by dividing the population base by 40 and the "ideal population for a single member Senate district" by 20.

(2) That the new district boundaries be established to contain "a number of persons as close to the formula as feasible" and that express and specific justification be given for "any substantial deviations from the population norms."

(3) That "an effort should be made to make the districts correspond, where feasible, with the approximate boundaries set out in the 1971 reapportionment plan" and that the districts be created of "contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area."

Using the population base of 302,361 (the Census total population enumeration), the ideal or norm for a single member House district would be 7,559 persons and for a single member Senate district 15, 118.

The first step in considering the new districting was to test the 1971 reapportionment districts using the total Census population and the above norms. The Court's instructions (other than using these districts "where feasible"), however, drastically altered both the population base and the general procedures followed by the Board in establishing the 1971 districts. The population base in the 1971 plan was the total population reported by the Census less the number of military personnel as of April 1, 1970 reported by the Department of Defense, not the Census. Adherence to the Court's instruction resulted

in further major changes in the 1971 plan's deviations from an ideal or norm.

The Court's further instructions effectively rule out the reasoning of the Board that deviations in individual districts are compensated by offsetting or balancing deviations of others in combination. The Court is specific in saying that the *individual* districts are to be as close to the norm "as feasible" and that any substantial deviations must be justified. Table 11 applies the total 1970 population to the House districts established in the 1971 plan. With the exception of the Barrow-Kobuk district, these deviations from the population norm are too great to be justified as entirely unavoidable or as being the best results possible. Accordingly, it was necessary to arrive at a new set of physical districts. In doing so the Masters were guided by the same concerns of the Board: that in addition to seeking arithmetically equal representation, the districts should also be an expression of natural geographic units and socio-economic communities as far as possible.

a. *Alaska's Regions and History*

Alaska's total land area of 586,400 square miles is one-fifth the total area of the continental United States, the equivalent of the greater part of the Middle West, approximately two and a quarter times the area of Texas. It stretches between the latitudes of 51 degrees and 72 degrees north and the meridians of 130 degrees west and 173 degrees east; and it contains four time zones within its boundaries. Because of its subcontinental size, Alaska should not be expected to be a single, homogeneous region, but several distinctive regions each with differing physical, climatological, and natural resources features. The main topographic features of mountain systems divide Alaska into five different and well defined "Alaskas" each in turn subdivided into distinct subregional units by river systems and other geographic features (Figure 1).

The topographic features produced by Alaska's geologic evolution influenced and to a large degree controlled the evolution of the total natural environment—climate, vegetative cover, wildlife, accessibility—and in turn also controlled human habitation. (Figures 2–6 [Figure 7 not included]) At the time of the first significant European contacts (*circa* 1740), the earlier Asian migrations had firmly established two contrasting major cultures and several marginal cultures under which lived an estimated 74,000 persons.[11] (See Figures 8–9) Extending northward up the Bering Sea coast and joining the shores of the Arctic Basin from Siberia to Greenland was found the Arctic culture of the Eskimo. As many as 40,000 of these people were probably living in the Alaska portion of this region at the time of the first European contacts. Most were located on the sea costs where marine and land resources provided the basis for a subsistence hunting and fishing economy, but some groups moved inland following or intercepting the migrations of the great caribou herds, and developing distinctive cultural and linguistic characteristics. Estimates suggest that 12,000 Eskimos lived in the Bristol Bay drainage and Yukon and Kuskokwim deltas, and another 28,000 lived on the Seward Peninsula, Kobuk drainage, Arctic Slope, Brooks Range and parts of interior Alaska.

The second major aboriginal culture was represented by the settlements on the northwest coast of the North American continent extending from the northern end of the Alexander Archipelago southward to northern California. Within Alaska this culture was represented by an estimated 10,000 Tlingit and 1,800 Haida who had launched an invasion into Tlingit territory from the Queen Charlotte Islands just prior to the first European contacts. The rela-

11. All estimates of aboriginal population from J. R. Swanton, *The Indian Tribes of North America*, Bulletin 145 (Washington: Bureau of American Ethnology, 1952).

tive mildness of the climate, in contrast to the extremes of the Arctic, and the abundance of salmon and other marine life resulted in one of the heaviest concentrations of aboriginal population found on this continent north of the highest civilization areas in Mexico and Central America, and the elaboration of a culture remarkably rich in art, oral literature, and social and legal organization.

The forest-hunting culture was represented by small groups of Indians of Athapascan stock, probably 5,200 scattered along the river systems of the interior plateau region, 500 in the Copper River basin, and 1,200 in the Kenai-Illiamna area. The remaining cultural group was the Aleut, some 16,000 occupying the Aleutian Islands and the Alaska Peninsula when the Russians arrived. These people were closely related to the Eskimo and in parts of southwest and southcentral Alaska they appeared to be inter-mixed.

The period of Russian and American occupation of Alaska up until the outbreak of World War II was one of limited and fluctuating settlement and narrowly specialized but intensive natural resource exploitation.[12] The explorations during the Eighteenth Century prepared the way for the extension of the Russian and the British fur trades into Alaska and the occupation of Alaska by Russia. For varying periods of destructive exploitation, whaling (1847–53) and the harvesting of fur seal and sea otter pelts (1760–1911) together with a variety of land furs set the economic and population patterns. After transfer to the United States the primary economic base shifted to other resources with the beginning of the canned salmon industry (1878 in southeastern and 1882–82 in central and western Alaska), the discovery of gold lode deposits in southeastern Alaska (1878–80) and gold placers at Nome and in the Interior (1898–1906), and the production of copper from the Kennecott mines (1911–38). Other natural resources were exploited dur-

ing this period, but made relatively minor contributions. (See Figure 10).

The only military forces in Alaska on June 30, 1937, were 298 infantry men and officers at Chilkoot Barracks (formerly Fort Seward) and 134 men and officers of the Army Signal Corps performing an essentially civilian function of maintaining the territory's wireless and telephone systems. This changed dramatically on the eve of World War II. The military in Alaska increased to 9,000 at July 1, 1941, and construction employment rose from a monthly average of 1,255 during calendar year 1940 to 10,521 during 1941. Military personnel reached 152,000 on July 1, 1946, dropped to 19,000 in 1946, then rose to 50,000 during the 1950's and stabilized at about 33,000 during the 1960's. (Refer to discussion of military in Part B, above) In addition to the introduction of new population, this period of defense resulted in major improvements and expansion of surface and air transportation which, in turn has greatly modified the past influence of geography upon both the separation of centers of settlement and economic development. (Figure 11)

During the past two decades there has been a definite shift in the basic Alaska economy from military to natural resources. Annual defense expenditures fell from an estimated $512.9 million in 1953 to $333.4 million in 1970 while annual value of natural resource products rose from $101.6 million to $671.7 million for the same years. The increase in natural resource products values was due primarily to the expansion of forest products industry in southeastern Alaska in the 1950's and petroleum in the Cook Inlet-Kenai area in the 1960's. The announcement of the Prudhoe Bay discoveries in 1968, plans for the further expansion of forest products in southeastern, southcentral and interior Alaska, the prospect of copper, iron ore and other mineral development and petroleum development in other regions all give promise of a con-

12. The remaining historical discussion is based upon G. W. Rogers, *The Future of* *Alaska* (Baltimore: The Johns Hopkin's Press 1962) pp. 60–102.

tinuing growth in importance of a natural resource based economy.

The history of Alaska can be most conveniently summarized in terms of a review of population trends by race and major regions. Table 12 (using the regions found on Figures 2 and 3, historical evidence of early population, and the decennial census enumerations from 1880–1970) presents the population changes by Native and non-Native races. The shifts in patterns and trends can all be keyed to the chronology of economic development. The drop in Native population until mid-century is attributable to the traditional fate of aboriginal peoples in periods of initial contact with alien peoples and forces; and the more recent rise is attributable to the effectiveness of public health and other social services.

The maps in the 1970 Census report of number of inhabitants locate the centers of present population and indicate by symbols the approximate population range of each place. The boundaries of the Census divisions reflect the major geographic features of Alaska as modified slightly by political organization. Except for the major population concentrations in the Anchorage and the Fairbanks North Star Borough (together accounting for 57% of Alaska's total population) the population is scattered in small and isolated cities and towns along the interior river system, along the coasts of the state and the islands of the Aleutian chain, the Gulf of Alaska and the Alexander Archipelago. (Figures 12–15)

b. *General Evaluation of Districting*

The development of the reapportionment districting was the product of adhering to two different, and· at times conflicting principles—achieving the mathematical ideal of "one-man-one-vote" while preserving as far as possible the identity and integrity of the system of natural and socio-economic regions and local boundaries which are the result of Alaska's geography and history. The mathematical task, which was the primary consideration, was com-

plicated by the relatively small total population base to be apportioned (e. g. a numerical change of a hundred persons creates a 1.3 percent variation), the vast total area over which this population was spread, and the highly irregular distribution pattern (57% of the population located in two compact urban centers and the remainder scattered in communities of varying sizes over a land area one-fifth that of the entire 48 continental states).

In spite of these problems, the assignment given by the Court has been accomplished in accordance with these standards with only one major variation from the population norm (Ketchikan) in a total of 40 House and 20 Senate districts. In the context of the natural region in which this district is located, however, the variation is minimized.

The geographic pattern of the districts results in combinations which conform to the major regions into which Alaska naturally and logically divides in geographic and socio-economic terms. The first three Senate districts form the Southeast region, with the population centers at Juneau and Ketchikan each comprising a Senate district. The eight-member Anchorage Senate district embraces a population core around which three rural Senate districts of larger area combine to include the total Gulf of Alaska drainage and the outer Aleutian Islands. The Bristol Bay-Bethel district is identical with the Southwest region and the North Slope-Bering Strait district is identical with the Northwest region. The Fairbanks districts define the urban-military core around which the large Interior district naturally belongs.

In regard to preservation of established regional entities, this proposed plan represents an important improvement over existing plans which break up the Bering Sea region, and combine part with the Interior. With the exception of minor borrowing from the Anchorage and Fairbanks boroughs to raise the population of contiguous districts, the proposed plan does not modify local government boundaries.

## c. *Establishing the Districts*

In order to arrive at precise boundary definitions and to make maximum use of the Census data, the redistricting was done on the basis of the 1970 Census divisions, areas and enumeration districts as listed on the published MED lists and Census tract maps. These units are well defined in the official documents; are broken down into small enough units to permit a satisfactory degree of flexibility in adjusting the larger units to approximate the population-representation ideals; are based upon sound socio-economic factors arrived at by long study and joint work of the staff of the United States Bureau of the Census and an advisory committee of Alaskans appointed by the Governor; and are an evolutionary outgrowth of similar divisions of Alaska into manageable local units extending back to the first official Census of Alaska in 1880. In short, these units reflect virtually all the forces which have produced contemporary Alaska.

*House District 1. Ketchikan:* This is a two-member district formed by a combination of the Ketchikan Census Division and the Outer Ketchikan Census Division. This includes the Ketchikan Gateway Borough, Annette Island (Coast Guard Station, Airfield and the Tsimshian town of Metlakatla) and surrounding areas. The economy is based upon fish processing, wood pulp manufacture, lumbering, transportation and communications. The area of the district is compact and strongly integrated. The 1970 population, however, falls short of the population norm set for representation by a variation of $-22.5\%$. This could be made up by attaching other areas, but the result would be merely to shift this over-representation elsewhere within the southeast region. It is not feasible to reach beyond the southeast region because of the clear separation of the region from the balance of Alaska (the air miles from the northwestern-most population in the region at Yakutat to the nearest population in

southcentral region, Cordova, is 225 miles). This is a growing area.[13] An immediate increase in population will follow completion of the Ketchikan airport. Moreover there are prospects of copper mining and the revival of the town of Hyder as a gateway into northern British Columbia.

*Senate District A. Ketchikan:* This is the same as House District 1.

*House District 2. Prince of Wales-Petersburg-Wrangell-Angoon:* This is a one-member district formed by the Prince of Wales Census Division, the Petersburg-Wrangell Census Division and the Angoon Census Division. The total population of this combination is only $-0.5\%$ below the population norm for representation. Together these divisions cover the principal fishing and forest harvesting areas of the southern half of the southeast region. The principal communities are the fishing-fish processing city of Petersburg and the fishing-fish processing and lumbering city of Wrangell. Other important places are the Tlingit villages of Kake, Klawock and Angoon and the primarily Haida villages of Craig and Hydaburg. Other settlements are engaged in logging or fishing and fish processing. The district is tied together by air transportation and water transportation.

*House District 3. Sitka:* This is a one-member district formed by the Sitka Census Division (which is also the Greater Sitka Borough) and the Yakutat area of the Skagway-Yakutat Census Division. The 1970 population is only one person short of the ideal population of 7,559. The splitting of the Skagway-Yakutat Census Division is a natural separation of two centers that are already geographically and economically separated from one another by the Haines Census Division, a portion of nothern British Columbia and 155 miles of some of the highest and most rugged mountain country on the continent. The most remote inhabited place in the Southeastern area is the Tlingit village of

13. Alaska Department of Labor, *Alaska's Manpower Outlook—1970's.* Issue # 11, March 12, 1972.

Yakutat which is supported by fishing extending southward to Icy Straits, logging for both the Sitka pulp mill and for export, and big game hunting. Hoonah is a major Tlingit community and, with the mixed racial communities of Elfin Cove and Pelican, its inhabitants engage in fishing in Icy Straits and elsewhere. Gustavus, a former transportation center and homesteading area, is now a gateway to Glacier Bay National Monument. Sitka provides the major population hub of the district with an economy based upon health, education and social services for the Native people at Mt. Edgecumbe, the second pulp mill in Alaska, fishing and fish processing, the first Pioneers' Home, transportation and communications.

*Senate District B. Alexander Archipelago:* This is composed of House Districts 2 and 3 and its variation from the population norm is —0.3%. This district includes virtually all of the islands of the Alexander Archipelago which are tied together naturally by the protected waters of the Inside Passage and other channels. It also includes all the aboriginal tribal areas of the Tlingit people except those located at Ketchikan, Juneau-Douglas, Haines and Klukwan. Sitka is the administrative and service center for programs operated by the federal government for these people.

*House District 4. Juneau:* This is a two-member district composed of the Juneau Census Division (which is also the City and Borough of Juneau), the Haines Census Division and the Skagway area of the . Skagway-Yakutat Census Division. The population is +4.3% above the norm. It is not possible to devise a logical and natural means to reduce the population as the main concentration is in the central part of the borough and the Haines ,and Skagway centers are tucked up in the northwest corner of the region remote from other population districts. The development of the Juneau area has been northward to Berners Bay (site of a planned pulp and lumber center) and southward to Snettisham (site of a hydro-electric proj-

ect which will serve the area). A road is being pushed southward from Haines to connect with the Juneau area by a short ferry run to Berners Bay. At present these areas are linked by air and ferry. Skagway is primarily a railroad terminus for Yukon Territory and Northwest Territories in Canada. Haines and Port Chilkoot are a highway terminus for the same Canadian areas and provides access to the Alaska Highway and interior Alaska. This is also a logging and lumber center with some fishing and an active tourist industry. Juneau is the state capitol and government is the primary business. There has been some lumbering in the past and presently there is the prospect of a revived and expanded forest products industry. Fishing, fish processing and tourism round out its economy. The total district was one of the principal gold producing areas in Alaska and is heavily mineralized. The most promising short-range prospects are iron ore mining and processing at Klukwan at the northern end of the district and similar mineral developments at Snettisham at the southern end. Near Skagway there is the prospect of the development of the Taiya-Yukon hydro-electric power complex. The whole district is quite distinctive from the rest of the southeast region because of its present and potential development and the fact that it is almost entirely composed of portions of the mainland.

*Senate District C. Juneau:* This is the same as House District 4.

*House District 5. Prince William Sound:* This is a one-member district composed of the Cordova-McCarthy, Valdez-Chitina-Whittier, and Seward Census Divisions and the Portage, Girdwood and Bird enumeration districts. The variation from the population norm is —1.6%. Together these units embrace the total drainage into the Prince William Sound and constitute one natural physical unit. The district also demonstrates a high degree of economic homogenity. Cordova was established as a rail terminus for the Copper River copper developments and will soon resume its role as a gateway community

with completion of the Copper River Highway and the prospects of an important tourism and minerals development in the area being tapped. Valdez, Whittier and Seward are all gateway transportation communities linked to the inland areas of the district via the interconnected railway and highway systems of which they form the port terminals. Cordova has a well established fishing and fish processing economy and Seward is developing a similar diversification of its present economic base.

*House District 6. Matanuska-Susitna:* This is a one-member district composed of Area II of the Matanuska-Susitna Census Division and Eklutna, Birchwood and Fire Lake Census enumeration districts from the Anchorage Census Division. Its variation from the population norm is +1.5%. This district includes most of the drainage of the Susitna and the Matanuska River systems, Alaska's most important agricultural areas, and the Glenn Highway connecting the Anchorage district to the Richardson Highway and the Alaska Highway. The prospects for the future development of the district include further urban and recreational development related to the Anchorage district, forest products and minerals.

*Senate District D. Prince William Sound-Matanuska-Susitna:* This is composed of House Districts 5 and 6 and has a variation from the population norm of −2.0%. The two House districts are linked by the common inter-connected highway system.

*House Districts 7–10. Anchorage:* The Anchorage District is composed of the Anchorage Census Division less the Census enumeration districts included with House Districts 5 and 6. The multi-member district has a combined variation from the population norm of +2.6%. The Anchorage District is the largest population concentration in the state but has a high degree of compactness despite its size. However, it is not advisable to constitute it as one district because of the large number of representatives and the unwieldy ballot which would result.

Close scrutiny of population characteristics in Anchorage do not reveal clearly delineated ethnic ghettoes. (See, Greater Anchorage Borough Planning Office, *People in Anchorage*, 1972). While some relatively low income and high income areas can be identified, they are not so compact or contiguous as to permit drawing apportionment lines along such a divide.

Nonetheless an attempt has been made to make the Anchorage subdivisions coincide with rough communities of interest which the Greater Anchorage Area Planning Office has defined as "planning districts". These districts in turn are derived from census tracts and enumerator districts.

Initial attempts to form districts of uniform numbers of representatives and senators was frustrated by the inability to break out exact numerical populations without resorting to an arbitrary block-by-block count. The Masters decided to form districts of varying numbers of representatives in order to both accomplish the numerical precision and preserve boundaries of "communities" which can be identified. The result was the proposed plan for a Northwest district of 5 representatives with a population variance of +2.7%; a Spenard district with three representatives and a population variance of +1.9%; a Northeast district with 5 representatives and a population variance of +2.1%; and, a South district with 3 representatives and a variance of +2.8%.

*Senate Districts E. Anchorage:* These are formed from the House Districts.

*House District 11. Cook Inlet:* This is a two-member district composed of the Kenai-Cook Inlet Census Division and the Lake Illiamna and Lake Clark Census enumeration districts from the Bristol Bay Census Division. The variation from the population norm is −2.3%. This district includes all but the northern-most portions of the Cook Inlet drainage and most of the area defined by the boundaries of the Cook Inlet Region Native Association. The current petroleum producing fields of

Alaska are all located within the district. It is also an important fishing area with a growing and diversified crab and other shell fish fisheries at the lower end of the Inlet. The district is served by air, highways and ferry systems. Tourism, outdoor recreation and agriculture add further to its basic economy.

*Senate District F. Cook Inlet:* This is the same as the House District.

*House District 12. Kodiak-Central:* This is a one-member district composed of the City of Kodiak, the U. S. Navy Station, other portions of the main Island draining into the Gulf of Alaska, and Afognak Island. The variation from the population norms is +0.1%. It contains major Navy and Coast Guard installations and is the center for important fishing and fish processing activities, primarily king and other varieties of crab. Some forest products harvesting is developing and there are prospects for further expansion. The district is tied to the mainland by scheduled air traffic and the ferry system.

*House District 13. Aleutian Islands-Western Gulf of Alaska:* This is a one-member district composed of the balance of the Kodiak Census Division and that portion of the Aleutian Islands Census Division to the west of Atka Island. The variation from the population norm is —2.7%. The principal population centers of this district are the Naval stations at Adak and Shemya. The portions of the Aleutian Census Division transferred to Bristol Bay (District 14) are oriented to fishing on both sides of the Alaska Peninsula and their people migrate into the Bay in search of salmon. Despite their separation, the remainder of the two Census divisions have a common orientation to Naval and Coast Guard operations because the islands form a natural barrier across the Bering Sea and the western end of the Gulf of Alaska. This district is unavoidably farflung because of the chain-like nature of these islands, the sparseness of population and the isolation of the principal population centers.

*Senate District G. Kodiak-Aleutian:* This district is composed of House districts 12 and 13. The variation from the population norm is —1.3%. Together they combine the Naval installations in Alaska and many of the Coast Guard posts. They share a common frontier, insular region.

*House District 14. Bristol Bay:* This is a one-member district composed of the Bristol Bay Census Division (less the Illiamna and Lake Clark districts transferred to the Cook Inlet district), plus the Pribilof Islands, the Alaska Peninsula, portions of the Aleutian Islands from the Aleutian Census Division, and the lower Kuskokwim Bay area from the Bethel Census Division. The variation from the norm is —2.6%. As defined here, the district naturally and logically combines areas and people who have a common orientation to marine pursuits and to the major fisheries of the Bristol Bay. The population is dominantly a mixture of Eskimo and Aleut with a few military personnel and non-Native persons engaged in fishing, trade, mining and transportation activities.

*House District 15. Bethel:* This is a one-member district composed of the Bethel Census Division (less the Kuskokwim Bay area) plus the Bering Sea drainage area south of the Yukon Delta from the Wade-Hampton Census Division. The variation from the population norm is +1.5%. The town of Bethel is the highest population concentration in the District and the many other places being scattered, small (ranging from 30–250) and isolated communities. There are the beginnings of commercial fishing and processing in the district and some possible minor mineral developments, but on the whole the local economy is a marginal one. The population is dominantly Eskimo.

*Senate District H. Bristol Bay-Bethel:* This is composed of House districts 14 and 15. The variation from the population norm is —0.6%.

*House District 16. Yukon-Koyukuk-Kuskokwim:* This is a one-member district composed of the up-stream portion of the

Wade-Hampton Census Division above Mountain Village, the Kuskokwim Census Division, the Yukon-Koyukuk Census Division less that area served by the interconnected highway system and the Alaska Railroad, and the midsection of the Upper Yukon Census Division including the Yukon River and the Porcupine River drainage. The variation from the population norm is +1.0%. This district combines the main river communities of Alaska and, as in the case of the Aleutian Islands, they are strung along lines over vast distances. It is necessary to include this huge territory in order to achieve sufficient population to comprise the base for a single-member district. All of the communities share common characteristics and interests, however, despite the distances involved. These are combination fishing, hunting, subsistence economies with an interspersing of military and trading outposts. The forms of transport and communication are river travel and air.

*House District 18. Nenana-Mt. McKinley:* This is a one-member district composed of the Southeast Fairbanks Census District, and remainders of the Upper Yukon and the Yukon-Koyukuk Census Districts, Area I from the Matanuska-Susitna Census District, and the Murphy Dome enumeration district from the Fairbanks Division. The variation from the population norm is −1.9%. This district combines all of the interior of Alaska interconnected by highway and rail transportation outside the urban-military center of Fairbanks. It contains two centers of population, one the transportation, trade, coal mining and power generating area from Nenana to Suntrana, and the other military and transportation center between Fort Greely and Tok. It also includes the Mt. McKinley National Park and the Denali Highway linking the mid-Railbelt area to the Richardson Highway and the Alaska Highway. Developments and settlements in the district are tied together by road and rail as well as air.

*Senate District I. Interior Alaska:* This is a combination of House Districts 16 and 18 and its variation from the population norm is −0.4%.

*House District 17. Fairbanks:* This is a six-member district composed of the Fairbanks Census Division less the Murphy Dome enumeration district which was extracted primarily to achieve the constitutionally required mathematical precision. It has a variation from the population norm of +0.7%. The area includes all of the Fairbanks North Star Borough except Murphy Dome and is the transportation, communications and trade center for Interior Alaska and most of the north. It also is the site of the University of Alaska, its related research facilities, and the major military bases for Northern Alaska (Fort Wainwright, Eielson Air Force Base). No attempt has been made to divide this into smaller member districts because the location of the two military reservations and the compactness of the urban center do not permit any logical or natural divisions or combinations.

*Senate District J. Fairbanks:* Same as House District 17.

*House District 19. North Slope:* This is a one-member district composed of the Barrow Census Division, Area I of the Upper Yukon Census Division, the Kobuk Census Division and the tip of Seward Peninsula northward from Shishmaref Inlet. It combines two natural geographic provinces and approximates the boundaries of the proposed North Slope Borough. The variation from the population norm is +2.7%. The people of the North Slope are dominantly Eskimos with the greatest population concentration at Barrow and the remainder in other smaller settlements. The Prudhoe Bay-Deadhorse area is the location of the current petroleum activity which will eventually spread across the total district. The Kobuk River-Kotzebue Sound drainage is the second natural geographic province included in the district. Kotzebue has the greatest population and is the trade and service center for the region. Its population is also dominantly Eskimo, many still leading subsistence ways of life based upon the hunting of marine

mammals, fishing and hunting up-river. This region contains promising copper potentials and other mineral prospects.

*House District 20. Bering Strait-Norton Sound:* This is a one-member district composed of the Nome Census Division less a small portion of Seward Peninsula transferred to District 19, and the Norton Sound Portions of the Yukon Delta from the Wade-Hampton Census Division. The variation for the population norm is +1.3%. It is a natural region composed of the drainages into the Bering Strait and Norton Sound. It also includes St. Lawrence Island, King Island and Little Diomede Island. The City of Nome is the population center and serves as a trade and transportation center for the district and as a back-up supply center for the more northern districts. The population is dominantly Eskimo living a subsistence way of life. This region was once one of the major gold producing regions in Alaska and is still highly mineralized. There are immediate prospects of tin development and longer range prospects for other minerals including petroleum.

*Senate District K. North Slope-Bering Strait:* This is composed of House Districts 19 and 20 and has a variation from the ideal population of +2.0%.

## SELECTED BIBLIOGRAPHY

(Keyed to topics:

(E) Economics
(G) Geography
(D) Demography
(H) History
(AN) Alaska Natives)

(G), (E), (D) Alaska Department of Labor, *Alaska, Geographic Presentation of 1970 Census Population Counts,* Juneau Alaska, 1971.

(E) Alaska Department of Labor, *Alaska Workforce Estimates, by Industry and Area,* published annually and available from 1961 to date.

(G), (E), (D) Alaska Department of Labor, *Alaska's Manpower Outlook,* *1970's,* Data Base and Projections, Publication No. 4 (undated).

(D) Alaska Department of Labor, *Current Population Estimates by Election District, Alaska,* published annually and available from 1960 to date.

(D), (E) Alaska Department of Labor, *1970 Alaska Population and Workforce Estimates by Race* (undated).

(D) Babb, James D., "Age and Sex Characteristics of Alaska's Population," *Alaska Review of Business and Economic Conditions,* Institute of Social, Economic and Government Research, March 1972, Vol. IX, No. 1.

(H) Bancroft, Hubert H., *History of Alaska, 1730–1885* (The History Co., San Francisco, 1886).

(G), (D) Cooley, R. A., *Alaska: A Challenge in Conservation* (University of Wisconsin Press, Madison, 1962).

(AN) Covarrubias, Miguel, *The Eagle, the Jaguar, and the Serpent* (Alfred A. Knopf, New York, 1954).

(AN) Drucker, Philip, *Cultures of the North Pacific Coast* (Chandler Publishing Co., San Francisco, 1965).

(AN) The Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land* (USGPO, Washington, 1968).

(G), (E) The Federal Field Committee for Development Planning in Alaska, *Economic Outlook for Alaska,* Anchorage, Alaska, 1971.

(E) The Federal Field Committee for Development Planning in Alaska, *A Subregional Economic Analysis of Alaska,* August 1968.

(D), (AN) Greater Anchorage Area Borough Planning Department, *People In Anchorage* (January 1972).

(H) Gruening, Ernest, *The State of Alaska: A Definitive History of America's Northernmost Frontier* (Random House, New York, 1968).

(AN) Lantis, Margaret, ed., *Ethnohistory in Southwestern Alaska and the*

898

*Southern Yukon* (The University of Kentucky Press, 1970).

(E), (E) Lin, Peter C., "Alaska's Population and School Enrollments," *Alaska Review of Business and Economic Conditions,* Institute of Social, Economic and Government Research, March 1972, Vol. IX, No. 1.

(G), (E), (D) National Resources Committee, *Regional Planning, Part VII —Alaska—Its Resources and Development* (USGPO, Washington, 1938).

(AN) Oswalt, Wendell H., *Alaskan Eskimos* (Chandler Publishing Co., San Francisco, 1965).

(G), (D) Rogers, George W., *Alaska Regional Population and Employment,* SEG Report No. 15, December 1967, Institutes of Social, Economic and Government Research, College, Alaska.

(H), (G), (E) Rogers, George, *Alaska in Transition, The Southeast Region* (The Johns Hopkins Press, Baltimore, 1960, 1967).

(E) Rogers, George W., "Alaska's Economy in the 1960's," *Alaska Review of Business and Economic Conditions,* Institute of Social, Economic

and Government Research, December 1970, Vol. VII, No. 6.

(G), (D), (E) Rogers, George W. with Cooley, R. A., *Alaska's Population and Economy, 1950–1980, Regional Growth, Development and Future Outlook,* Vol. I—Analysis, Vol. II—Statistical Handbook, Economic Series: Publication No. 1, 1963, University of Alaska, College, Alaska.

(H), (G), (E) Rogers, George W., *The Future of Alaska: The Economic Consequences of Statehood* (The Johns Hopkins Press, Baltimore, 1962, 1969).

(D), (E), (AN) Rogers, George W., "Alaska Native Population, Trends and Vital Statistics, 1950–1985," *Research Notes,* Institute of Social, Economic and Government Research, 1971.

(G), (E), (D) Snodgrass, John R., *Alaska Statistical Review, 1970,* Department of Economic Development, December 1970.

(D) U. S. Bureau of the Census, all publications on Alaska from 1880 to 1970.

(G) Williams, Howel, ed., *Landscapes of Alaska, Their Geologic Evolution* (University of California Press, Berkeley, 1958).

## TABLE 1

COMPARISON OF 1970 CIVILIAN POPULATION CALCULATION
BUREAU OF THE CENSUS AND GOVERNOR'S ADVISORY BOARD

|  | United States Bureau of the Census | Governor's Advisory Board |
|---|---|---|
| Total 1970 Alaska Population | 302,361 | 302,361 |
| Less: Members of Armed Forces | 32,113 | 31,523 |
| Total 1970 Alaska Civilian Population | 270,248 | 270,838 |

SOURCE:  United States Department of Commerce, Bureau of the
Census, Report PC(1)-C3, Alaska, Table 53 and official
correction announcements, "Report of the Governor's
Advisory Board," Nov. 2, 1971 and tabulation of "Military
Personnel - 4/1/70" submitted by Board.

[A6724]

## TABLE 2

"MEMBERS OF ARMED FORCES," CENSUS COUNT
AND GOVERNOR'S ADVISORY BOARD FIGURES,
BY AREA AND PLACE 1970

| | 1970 Census | | Governor's Advisory Reapport. Board | |
| --- | --- | --- | --- | --- |
| | Place | Census Division Total | Place | Census Division Total |
| TOTAL STATE | | 32,113* | | 31,523 |
| Prince of Wales | – | – | – ) | |
| Ketchikan | | | ) | |
|   –City of | 80 | | – ) | |
|   –Remainder | 117 | 197 | – ) | 5 |
| Outer Ketchikan | | | ) | |
|   –Annette Is. C.G. | 137 | | – ) | |
|   –Remainder | – | 137 | – ) | |
| Wrangell–Petersburg | | 51 | – | – |
| Sitka | | | | |
|   –City of | 26 | | | |
|   –Remainder | 111 | 137 | – | – |
| Angoon | – | – | – | – |
| Juneau | | | | |
|   –City of | 126 | | ) | |
|   –Remainder | 79 | 205 | ) | 135 |
| Haines | | 9 | – | – |
| Skagway–Yakutat | | 21 | – | – |
|    TOTAL SOUTHEAST | | 757 | | 140 |

*Includes 688 estimated by G. Rogers as military portion of
under-count for Ft. Richardson.
[A6698]

| | 1970 Census | | Governor's Advisory Reapport. Board | |
|---|---|---|---|---|
| | Place | Census Division Total | Place | Census Division Total |
| Cordova-McCarthy | | 38 | | 2 |
| (Less Area I) | | | | |
| Valdez-Chitna-Whittier | | - | | - |
| (Less Area I) | | | | |
| Seward | | 91 | | - |
| | | | | |
| Anchorage | | | | |
|   -Elmendorf | 2,431 | | 7,965 | |
|   -Ft. Richardson | 4,132* | | 6,390 | |
|   -Anchorage (City) | 4,747 | | 219 | |
|   -Spenard | 378 | | - | |
|   -Sand Lake | 19 | | - | |
|   -Campbell Point ) | 1,865 | ( | 200 | |
|   -Remainder    ) | | ( 13,572 | | 14,774 |
| Matanuska-Susitna | | 6 | | - |
| Kenai-Cook Inlet | | | | |
|   -Wildwood AFS | 417 | | 380 | |
|   -Kenai (City of) | 67 | | - | |
|   -Remainder | - | 484 | - | 380 |
| | | | | |
| Kodiak Island | | | | |
|   -Naval Station | 1,269 | | ) | |
|   -Kodiak (City of) | 182 | | ) | |
|   -Remainder | 40 | 1,491 | ) | 1,145 |
| | | | | |
| Aleutian Island | | | | |
|   -Adak Station | 1,133 | | 2,350 | |
|   -Shemya Station | 1,131 | | 980 | |
|   -Clam Lagoon NC Sta. | 646 | | - | |
|   -Mt. Moffett-NRS Sta. | 327 | | - | |
|   -Attu      ) | | ( | 7 | |
|   -Cold Bay  ) | 452 | ( | 90 | |
|   -Remainder ) | | ( 3,689 | - | 3,427 |
| Bristol Bay | | | | |
|   -King Salmon AFB | 403 | | 460 | |
|   -Remainder | 36 | 439 | - | 460 |
| | | | | |
| Bethel | | | | |
|   -Pt. Newenham AFS | 88 | | 90 | |
|   -Remainder | 7 | 95 | - | 90 |
| | | | | |
| Wade Hampton | | | | |
|   -Cape Romanzorf AFS | 96 | | 95 | |
|   -Remainder | 73 | 169 | - | 95 |
| | | | | |
| TOTAL - SOUTHCENTRAL - SOUTHWEST | | 20,074 | | 20,373 |

*Includes estimated correction of 688.

[A6699]

| | 1970 Census | | Governor's Advisory Reapport. Board | |
| | Place | Census Division Total | Place | Census Division Total |
|---|---|---|---|---|
| **Barrow** | | | | |
| –Barrow | 25 | | – | |
| –Cape Lisburne AFS | 83 | | 90 | |
| –Remainder | – | 108 | – | 90 |
| **Kobuk** | | | | |
| –Kotzebue | 95 | | 100 | |
| –Remainder | 10 | 105 | – | 100 |
| **Nome** | | | | |
| –Tin City | ) | | 100 | |
| –Remainder | ) | 151 | 10 | 110 |
| **TOTAL NORTHWEST** | | 364 | | 300 |
| **Fairbanks** | | | | |
| –Eielson | 2,320 | | 3,035 | |
| –Ft. Wainwright | 5,019 | | 5,570 | |
| –Fairbanks (City of) | 699 | | 10 | |
| –College | 42 | | – | |
| –Murphy Dome AFS | 200 | | 150 | |
| –Remainder | 509 | 8,789 | – | 8,765. |
| **Upper Yukon** | | | | |
| –Ft. Yukon AFS | 85 | | 100 | |
| –Remainder | 18 | 103 | – | 100 |
| **Southeast Fairbanks** | | | | |
| –Ft. Greely | 1,042 | 1,042 | 935 | 935 |
| **Yukon-Koyukuk** | | | | |
| –Campton AFB | 143 | | 130 | |
| –Galena AFB | 279 | | 225 | |
| –Clear ) | | | 130 | |
| –Bettles ) | | | 5 | |
| –Indian Mt. ) | 307 | | 150 | |
| –Remainder ) | | 729 | – | 640 |
| **Kuskokwim** | | | | |
| –Takotna (Tatalina)AFB | 153 | | 130 | |
| –Sparrevahn ) | 102 | | 140 | |
| –Remainder ) | | 255 | – | 270 |
| **TOTAL INTERIOR** | | 10,918 | | 10,710 |

[A6700]

## TABLE 3

### TOTAL AND CIVILIAN POPULATION BY CENSUS DIVISION - 1970

| Census Division | Total | Armed Forces | Civilian |
|---|---|---|---|
| ALASKA TOTAL | 302,361 | 32,113 | 270,248 |
| Prince of Wales | 2,106 | - | 2,106 |
| Ketchikan | 10,041 | 197 | 9,844 |
| Outer Ketchikan | 1,676 | 137 | 1,539 |
| Wrangell-Petersburg | 4,913 | 51 | 4,862 |
| Sitka | 6,109 | 137 | 5,972 |
| Angoon | 503 | - | 503 |
| Juneau | 13,556 | 205 | 13,351 |
| Haines | 1,504 | 9 | 1,495 |
| Skagway-Yakutat | 2,157 | 21 | 2,136 |
| Cordova-McCarthy | 1,857 | 38 | 1,819 |
| Valdez-Chitina-Whittier | 3,098 | - | 3,098 |
| Seward | 2,336 | 91 | 2,245 |
| Matanuska-Susitna | 6,509 | 6 | 6,503 |
| Anchorage | 126,333 | 13,572 | 112,761 |
| Kenai-Cook Inlet | 14,250 | 484 | 13,766 |
| Kodiak | 9,409 | 1,491 | 7,918 |
| Aleutian Island | 8,057 | 3,689 | 4,368 |
| Bristol Bay Borough | 1,147 | 5 | 1,142 |
| Bristol Bay | 3,485 | 434 | 3,051 |
| Kuskokwim | 2,306 | 255 | 2,051 |
| Yukon-Koyukuk | 4,752 | 729 | 4,023 |
| Upper Yukon | 1,684 | 103 | 1,581 |
| Southeast Fairbanks | 4,179 | 1,042 | 3,137 |
| Fairbanks | 45,864 | 8,789 | 37,075 |
| Barrow | 2,663 | 108 | 2,555 |
| Kobuk | 4,434 | 105 | 4,329 |
| Nome | 5,749 | 151 | 5,598 |
| Wade-Hampton | 3,917 | 169 | 5,598 |
| Bethel | 7,579 | 95 | 7,484 |

[A6701]

## TABLE 4

### MEMBERS OF ARMED FORCES IN ALASKA
### (AS OF JULY 1)

| Year | Members | | Year | Members |
|------|---------|---|------|---------|
| 1950 | 26,000 | | 1960 | 33,000 |
| 1951 | 38,000 | | 1961 | 33,000 |
| 1952 | 50,000 | | 1962 | 33,000 |
| 1953 | 50,000 | | 1963 | 34,000 |
| 1954 | 49,000 | | 1964 | 35,000 |
| | | | | |
| 1955 | 50,000 | | 1965 | 33,000 |
| 1956 | 45,000 | | 1966 | 32,000 |
| 1957 | 48,000 | | 1967 | 33,000 |
| 1958 | 35,000 | | 1968 | 33,000 |
| 1959 | 34,000 | | 1969 | 32,000 |
| | | | | |
| | | | 1970 | 32,000 |

SOURCE: United States Bureau of the Census, <u>Current Population Estimate</u>, Series P-25 (Published data rounded to nearest thousand).

[A6702]

## TABLE 5

CENSUS ENUMERATIONS OF MEMBERS OF ARMED FORCES
(AS OF APRIL 1 OR CENSUS REFERENCE WEEK)

| 1960 Census Districts | 1950 | 1960 | 1970 |
|---|---|---|---|
| Alaska Total | 20,407 | 32,692 | 32,113 |
| Prince of Wales | - | 5 | - |
| Ketchikan | 370 | 300 | 334 |
| Wrangell-Petersburg | 6 | - | 51 |
| Sitka | 52 | 85 | 137 |
| Juneau | 220 | 200 | 205 |
| Lynn Canal-Icy Straits | 12 | 19 | 30 |
| Cordova-McCarthy | 8 | 202 | 38 |
| Valdez-Chitina-Whittier | 487 | 465 | - |
| Palmer-Wasilla-Talkeetna | 10 | 26 | 6 |
| Anchorage | 8,467 | 14,278 | 13,572 |
| Seward | 16 | - | 91 |
| Kenai-Cook Inlet | 3 | 407 | 484 |
| Kodiak | 1,889 | 1,807 | 1,491 |
| Aleutian Islands | 2,894 | 2,417 | 3,689 |
| Bristol Bay | 97 | 539 | 439 |
| Bethel | 4 | 125 | 95 |
| Kuskokwim | 1 | 152 | 255 |
| Yukon-Koyukuk | 6 | 773 | 729 |
| Fairbanks | 5,352 | 9,950 | 9,831 |
| Upper Yukon | 61 | 123 | 103 |
| Barrow | - | 154 | 108 |
| Kobuk | 37 | 90 | 105 |
| Nome | 410 | 504 | 151 |
| Wade-Hampton | 5 | 71 | 169 |

SOURCE: United States Bureau of the Census.
[A6703]

TABLE 6

MEMBERS OF ARMED FORCES IN ALASKA BY 1960 CENSUS DISTRICTS - 1960-1970
(AS OF JULY 1, ANNUALLY)

| Area Code | 1960 Census District | 1960 | 1964 | 1965 | 1966 | 1967 | 1968 | 1969 | 1970 |
|---|---|---|---|---|---|---|---|---|---|
| 01 | Prince of Wales | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 02 | Ketchikan | 300 | 300 | 340 | 340 | 347 | 341 | 327 | 420 |
| 03 | Wrangell-Petersburg | 0 | 5 | 13 | 13 | 23 | 19 | 23 | 23 |
| 04 | Sitka | 85 | 85 | 66 | 66 | 66 | 66 | 66 | 66 |
| 05 | Juneau | 199 | 229 | 226 | 221 | 242 | 214 | 232 | 232 |
| 06 | Lynn Canal-Icy Straits | 19 | 35 | 21 | 21 | 22 | 13 | 21 | 21 |
| 07 | Cordova-McCarthy | 202 | 198 | 66 | 66 | 66 | 62 | 66 | 63 |
| 08 | Valdez-Chitina-Whittier | 450 | 32 | 20 | 20 | 15 | 0 | 0 | 0 |
| 09 | Palmer-Wasilla-Talkeetna | 26 | 27 | 73 | 150 | 0 | 0 | 0 | 0 |
| 10 | Anchorage | 14,183 | 14,908 | 15,150 | 15,159 | 15,009 | 15,209 | 14,459 | 13,910 |
| 11 | Seward | 0 | 0 | 51 | 51 | 52 | 53 | 53 | 53 |
| 12 | Kenai-Cook Inlet | 403 | 300 | 154 | 200 | 250 | 300 | 453 | 53 |
| 13 | Kodiak | 1,807 | 2,157 | 2,287 | 1,512 | 1,826 | 1,521 | 1,674 | 1,467 |
| 14 | Aleutian Islands | 2,412 | 2,000 | 2,545 | 3,158 | 3,758 | 3,599 | 3,657 | 3,507 |
| 15 | Bristol Bay | 536 | 540 | 410 | 430 | 530 | 480 | 470 | 400 |
| 16 | Bethel | 125 | 132 | 85 | 100 | 100 | 100 | 100 | 90 |
| 17 | Kuskokwim | 152 | 152 | 150 | 270 | 275 | 270 | 270 | 250 |
| 18 | Yukon-Koyukuk | 769 | 792 | 860 | 925 | 750 | 750 | 730 | 630 |
| 19 | Fairbanks | 9,880 | 9,520 | 9,740 | 9,610 | 9,420 | 8,920 | 8,922 | 9,170 |
| 20 | Upper Yukon | 123 | 125 | 90 | 100 | 250 | 250 | 250 | 220 |
| 21 | Barrow | 148 | 165 | 70 | 100 | 100 | 100 | 100 | 80 |
| 22 | Kobuk | 90 | 99 | 100 | 100 | 100 | 100 | 100 | 100 |
| 23 | Nome | 504 | 528 | 405 | 488 | 378 | 338 | 288 | 129 |
| 24 | Wade-Hampton | 71 | 66 | 95 | 100 | 100 | 100 | 100 | 100 |
| | TOTAL | 32,489 | 32,404 | 33,017 | 33,200 | 33,679 | 32,808 | 32,359 | 30,984 |

SOURCE: Alaska Department of Labor, Research and Analysis worksheets, based upon Alaskan Command and United States Coast Guard data on numbers and location of uniformed personnel stationed in Alaska as of July 1 each year.

CA67043

TABLE 7

MEMBERS OF ARMED FORCES BY TYPE OF LIVING QUARTERS

| Census Division & Place | In Military Barracks, On Ships, Etc. | In Households | | Total All Places |
|---|---|---|---|---|
| | | On-Base | Off-Base | |
| Alaska Total | 16,659 | 7,337 | 8,117 | 32,113 |
| Ketchikan | | | 197 | 197 |
| Outer Ketchikan | | 137 | | 137 |
| Wrangell-Petersburg | 51 | | | 51 |
| Sitka | 111 | | 26 | 137 |
| Juneau | | | 205 | 205 |
| Haines | 9 | | | 9 |
| Skagway-Yakutat | 21 | | | 21 |
| Cordova-McCarthy | - | - | 38 | 38 |
| Seward | 91 | | | 91 |
| Matanuska-Susitna | - | - | 6 | 6 |
| Anchorage | | | | |
| -Elmendorf | 1,585 | 846 | - | 2,431 |
| -Ft. Richardson | 1,725 | 2,407 | - | 4,132 |
| -Remainder | 582 | - | 6,427 | 7,009 |
| Kenai-Cook Inlet | | | | |
| -Wildwood Station | 142 | 275 | - | 417 |
| -Kenai | - | - | 67 | 67 |
| Kodiak | | | | |
| -U.S.N. Station | 776 | 493 | - | 1,269 |
| -Kodiak | - | - | 182 | 182 |
| -Remainder | 40 | - | - | 40 |
| Aleutian Islands | 3,339 | 350 | - | 3,689 |
| Bristol Bay Borough | - | - | 5 | 5 |
| Bristol Bay | 411 | - | 23 | 434 |
| Kuskokwim | 255 | | | 255 |
| Yukon-Koyukuk | 599 | 130 | - | 729 |
| Upper Yukon | 103 | - | - | 103 |
| Southeast Fairbanks | | | | |
| -Ft. Greeley | 621 | 421 | - | 1,042 |
| -Remainder | - | - | - | - |
| Fairbanks | | | | |
| -Ft. Wainwright | 3,778 | 1,241 | - | 5,019 |
| -Eielson | 1,283 | 1,037 | - | 2,320 |
| -Remainder | 509 | - | 941 | 1,450 |
| Barrow | 108 | | | 108 |
| Kobuk | 105 | - | - | 105 |
| Nome | 151 | - | - | 151 |
| Wade-Hampton | 169 | - | - | 169 |
| Bethel | 95 | - | - | 95 |

SOURCE:  United States Bureau of the Census, PC(1)-B3, Alaska
Tables 31, 32, 33 and Table 2, this report.

[A6705]

### TABLE 8

### COMPARATIVE MIGRANT STATUS OF RESIDENTS
### OF MAJOR MILITARY BASES - 1970

| Census Division, Military Base | Total Pop. 5 Years and Over | Out of State Migrants[1] | |
| --- | --- | --- | --- |
| | | Number | Percent Persons 5 Yrs. & Over |
| Anchorage Division | | | |
|   -Elmendorf | 5,405 | 4,306 | 79.7 |
|   -Ft. Richardson | 7,673 | 5,488 | 71.5 |
|   -Remainder | 98,200 | 9,794 | 36.0 |
| | | | |
| Fairbanks Division | | | |
|   -Eielson | 5,488 | 3,927 | 71.6 |
|   -Ft. Wainwright | 8,121 | 5,592 | 68.9 |
|   -Remainder | 27,543 | 8,877 | 32.2 |
| | | | |
| Kodiak Island Division | | | |
|   -U.S. Navy Station | 2,676 | 1,986 | 74.2 |
|   -Remainder | 5,664 | 1,463 | 25.8 |

---

[1] Persons who resided outside Alaska on April 1, 1965.

SOURCE: United States Bureau of the Census, Report PC(1)-C3,
[A6706] Alaska - Tables 117, 119.

TABLE 9

COMPARISON OF RELATIVE ELECTION PARTICIPATION
OF POPULATION OF VOTING AGE

|  | (1) | (2) | (3) | (3) ÷ (2) |
|---|---|---|---|---|
|  | April 1, 1970 Population 18 Yrs. & Over | July 1, 1970 Population Estimates 1/ | Number of Voters, Gen. Election, Nov. 3, 1970 | Percent Voting |
| **1. Military Reservations** |  |  |  |  |
| Elmendorf | 3,434 | N.A. | N.A. |  |
| Ft. Richardson | 6,284 | N.A. | N.A. |  |
| Sub-total | 9,818 | 9,445 | 102 | 1.1 |
| Eielson | 3,535 | N.A. | 123 |  |
| Ft. Wainwright | 6,462 | N.A. | 49 |  |
| Sub-total | 9,997 | 10,276 | 172 | 1.7 |
| Ft. Greeley | (1,271) 2/ | N.A. | N.A. | N.A. |
| Shemya Station | 1,131 | 1085 | - | - |
| Adak Station | 1,228 | 1,178 | 108 | 9.2 |
| Kodiak Station | 1,790 | 1,717 | 78 | 4.5 |
| **2. Remainder of State** | 151,571 2/ | 157,571 | 81,945 | 52.0 |
| TOTAL STATE | 181,680 | 181,272 | 82,405 | 45.5 |

N.A. = Not Available.

1/ Military Reservations population adjusted by July 1, 1970, Armed
   Forces Count.

2/ Ft. Greeley included in "Remainder of State" because voting records
   not available on segregated population.

SOURCE: Population data from United States Bureau of the Census,
        Report PC(1)-B3, Alaska, Tables 19, 31 and 32, State
        of Alaska, Official Returns by Election Precinct, General
        Election, November 3, 1970.  Armed Forces, July 1, 1970,
        from Table 6.

[A6707]

TABLE 10

1971 REAPPORTIONMENT DISTRICTS - EQUAL HOUSE REPRESENTATION
WITH THREE DIFFERENT POPULATION BASES

| 1971 Reapportionment House Election Districts | 1. Total Population | | | 2. Total Population Less Military in Group Quarters | | | 3. Civilian Population | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Popu-lation | Divided by 7,559 | Rounded to Whole Nos. | Less: Est. Nonresident Members Armed Forces[1] | Divided by 7,148 | Rounded to Whole Nos. | Civil-ian Popu-lation | Divided by 6,756 | Rounded to Whole Nos. |
| 1. Ketchikan-Prince of Wales | 13,832 | 1.829 | 2 | 13,823 | 1.935 | 2 | 13,489 | 1.997 | 2 |
| 2. Petersburg-Wrangell | 4,913 | 0.650 | 1 | 4,862 | 0.681 | 1 | 4,862 | 0.720 | 1 |
| 3. Sitka | 6,612 | 0.875 | 1 | 6,501 | 0.910 | 1 | 6,475 | 0.958 | 1 |
| 4. Juneau | 13,556 | 1.793 | 2 | 13,556 | 1.898 | 2 | 13,351 | 1.976 | 2 |
| 5. Lynn Canal-Icy Straits | 3,661 | 0.484 | 0 | 3,631 | 0.508 | 1 | 3,631 | 0.537 | 1 |
| 6. Cordova-Valdez-Seward | 6,655 | 0.880 | 1 | 6,655 | 0.932 | 1 | 6,526 | 0.966 | 1 |
| 7. Palmer | 6,509 | 0.861 | 1 | 6,418 | 0.899 | 1 | 6,503 | 0.963 | 1 |
| 8-11. Anchorage | 126,333 | 16.713 | 17 | 122,441 | 17.142 | 17 | 112,761 | 16.690 | 17 |
| 12. Kenai-Cook Inlet | 14,250 | 1.885 | 2 | 14,108 | 1.975 | 2 | 13,766 | 2.038 | 2 |
| 13. Kodiak | 9,409 | 1.245 | 1 | 8,593 | 1.203 | 1 | 7,918 | 1.172 | 1 |
| 14. Aleutian-Bristol Bay | 12,239 | 1.619 | 2 | 8,489 | 1.188 | 1 | 8,111 | 1.201 | 1 |
| 15. Yukon-Kuskokwim | 7,058 | 0.934 | 1 | 6,204 | 0.869 | 1 | 6,074 | 0.899 | 1 |
| 16. Rural Fairbanks | 6,097 | 0.807 | 1 | 5,373 | 0.752 | 1 | 4,952 | 0.733 | 1 |
| 17. Fairbanks-North Star | 45,864 | 6.067 | 6 | 40,294 | 5.642 | 6 | 37,075 | 5.488 | 5 |
| 18. Barrow-Kobuk | 7,499 | 0.992 | 1 | 7,286 | 1.020 | 1 | 7,286 | 1.078 | 1 |
| 19. Nome | 5,749 | 0.761 | 1 | 5,598 | 0.784 | 1 | 5,598 | 0.829 | 1 |
| 20. Wade-Hampton | 4,938 | 0.653 | 1 | 4,769 | 0.668 | 1 | 4,769 | 0.706 | 1 |
| 21. Bethel | 7,196 | 0.952 | 1 | 7,101 | 0.994 | 1 | 7,101 | 1.051 | 1 |
| TOTAL ALASKA | 302,361 | 40.000 | 42[2] | 285,702 | 40.000 | 42[2] | 270,248 | 40.002 | 41[2] |

[1] Nonresident defined as military personnel residing in barracks and on board ships, unaccompanied by dependents (51.9% of total military).

[2] Total Alaska exceeds 40 because of rounding.

[A67083]

## TABLE 11

### POPULATION CHARACTERISTICS OF THE 1971 REAPPORTIONMENT PLAN - HOUSE DISTRICTS

$$\frac{302,361}{40} = 7,559 \text{ POPULATION NORM PER REPRESENTATIVE}$$

| (1) House Dist. No. | (2) House Dist. Name | (3) Population | (4) No. of Seats | (5) Pop./Rep. | (6) Population Deviation and Change to Give Equal Representation Shortage (Add) | Excess (Deduct) | (7) Percent Over and Under Population Per Representative |
|---|---|---|---|---|---|---|---|
| 1 | Ketchikan-Prince of Wales | 13,823 | 2 | 6,912 | 647 | | - 8.56 |
| 2 | Petersburg-Wrangell | 4,913 | 1 | 4,913 | 2,646 | | - 35.00 |
| 3 | Sitka | 6,612 | 1 | 6,612 | 947 | | - 12.53 |
| 4 | Juneau | 13,556 | 2 | 6,778 | 781 | | - 10.33 |
| 5 | Lynn Canal-Icy Straits | 3,661 | 1 | 3,661 | 3,898 | | - 51.57 |
| 6 | Cordova-Valdez-Seward | 6,655 | 1 | 6,655 | 904 | | - 11.96 |
| 7 | Palmer | 6,509 | 1 | 6,509 | 1,050 | | - 13.89 |
| 8 | Anchorage Northeast | | | | | | |
| 9 | Anchorage Northwest | | | | | | |
| 10 | Anchorage Southeast | 126,333) | 16) | 7,896) | | 337) | + 4.46) |
| 11 | Anchorage Southwest | | | | | | |
| 12 | Kenai-Cook Inlet | 14,250 | 2 | 7,125 | | 434 | - 5.74 |
| 13 | Kodiak | 9,409 | 1 | 9,409 | | 1,850 | + 24.47 |
| 14 | Aleutian-Bristol Bay | 12,239 | 1 | 12,239 | | 4,680 | + 61.92 |
| 15 | Yukon-Kuskokwim | 7,058 | 1 | 7,058 | 501 | | - 6.63 |
| 16 | Rural Fairbanks | 6,097 | 1 | 6,097 | 1,492 | | - 19.34 |
| 17 | Fairbanks-North Star | 45,864 | 5 | 9,173 | | 1,614 | + 21.35 |
| 18 | Barrow-Kobuk | 7,499 | 1 | 7,499 | 60 | | - 0.79 |
| 19 | Nome | 5,749 | 1 | 5,749 | 1,810 | | - 23.94 |
| 20 | Wade-Hampton | 4,938 | 1 | 4,938 | 2,621 | | - 34.67 |
| 21 | Bethel | 7,196 | 1 | 7,196 | 363 | | - 4.80 |

[A67091]

TABLE 12

ALASKA'S NATIVE AND NON-NATIVE POPULATION, BY REGION 1740-1970

| Year or Date | Southeast | | Southcentral | | Southwest | | Interior | | Northwest | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Native | Non-Native | Native | Non-Native | Native | Non-Native | Native | Non-Native | Native | Non-Natl |
| Circa 1740-80 | 11,800 | - | 3,700 | - | 26,000 | - | 5,200 | - | 10,500 | - |
| 1839 | 8,860 | 400 | 3,907 | 250 | 11,249 | 50 | 4,000 | - | 12,003 | - |
| 1880 | 7,455 | 293 | 4,318 | 34 | 13,826 | 88 | 2,560 | 8 | 4,837 | 7 |
| 1890 | 5,967 | 2,071 | 3,566 | 2,546 | 10,660 | 1,411 | 2,188 | 145 | 2,973[1] | 525 |
| June 1, 1900 | 5,800 | 8,550 | 4,000 | 6,000 | 9,600 | 3,400 | 3,000 | 2,600 | 7,142 | 13,500 |
| Dec. 31, 1909 | 5,866 | 9,350 | 3,205 | 9,695 | 7,326 | 4,723 | 2,403 | 10,661 | 6,531 | 4,596 |
| Jan. 1, 1920 | 5,357 | 12,045 | 3,000 | 8,173 | 10,151 | 1,390 | 2,500 | 5,464 | 5,550 | 1,406 |
| Oct. 1, 1929 | 5,990 | 13,314 | 3,559 | 8,321 | 10,735 | 1,383 | 3,329 | 4,917 | 6,370 | 1,360 |
| Oct. 1, 1939 | 6,502 | 18,739 | 3,974 | 10,907 | 10,858 | 1,988 | 3,462 | 6,883 | 7,662 | 1,549 |
| April 1, 1950 | 7,929 | 20,274 | 3,788 | 46,305 | 10,838 | 6,877 | 3,666 | 19,342 | 7,663 | 1,961 |
| April 1, 1960 | 9,242 | 26,161 | 5,514 | 103,337 | 14,314 | 6,687 | 4,638 | 44,490 | 9,373 | 2,411 |
| April 1, 1970 | 8,162 | 34,403 | 9,379 | 154,379 | 17,115 | 9,564 | 5,578 | 51,221 | 10,656 | 2,190 |

1   This appears to be an under-count by the Census, although other evidence indicates that a sharp decline actually occurred.

SOURCES:   1740 based upon estimates by Mooney (1928) published in J.W. Swanton, The Indian Tribes of North America, Bulletin 145, Washington Bureau of American Ethnology (1952). Northwest estimate reduced in accordance with more recent studies. Estimates for 1839 based upon reports by Venianinow (1835) and others in "Resources of Alaska," 10th Census of the United States, 1880, Vol. VIII, Washington, D. C., 1884, pp. 36-38. Other data from regular U.S. Bureau of the Census Reports for 1880 through 1970. Native data for 1970 partly estimated.

LA6710J

Figure 1. Source: G. W. Rogers, Alaska in Transition (Baltimore: The Johns Hopkins Press, 1960), p. 44.

LA61103

Generalized Agricultural Areas of Alaska, 1965

**Figure 2.  Source:** R. A. Cooley, <u>Alaska, A Challenge in Conservation</u> (Madison: University of Wisconsin Press, 1967), p. 140.

[A6111]

Forests of Alaska, 1965

**Figure 3. Source: R. A. Cooley, op. cit., p. 141.**

[A6112]

Critical Big Game Areas, 1965: Goat, Sheep, and Bear

**Figure 4. Source: R. A. Cooley, <u>op. cit</u>. p. 143.**

[A6113]

Critical Big Game Areas, 1965: Moose and Caribou

**Figure 5.    Source:    R. A. Cooley, <u>op. cit.</u>, p. 141.**

[A6114]

Major Waterfowl and Fish Areas in Alaska, 1965

Figure 6. Source: R. A. Cooley, op. cit., p.1⁴⁴

[A6115]

Figure 8.   Source:   W. H. Oswalt, Alaskan Eskimos (San
                      Francisco: Chandler Publishing Company,
[A6116]               1967), p. 7, map 2.

Figure 9. Source: G. W. Rogers, op. cit., facing p. 180, Figure 10.

Paths of economic penetration of Alaska, 1760's to 1940's

Figure 10.    Source::   G. W. Rogers, ed. Change
                        In Alaska (College and
                        Seattle: University of
                        Alaska Press, University
                        of Washington Press, 1970)
                        p. 17.

[A6118]

Transportation Routes in Alaska, 1965

Figure 11.  Source:  R. A. Cooley, op. cit., p. 136.

[A6119]

Census Division Subdivisions/Boroughs, Reservations, and Places

Figure 12. Source: U. S. Bureau of the Census, <u>1970 Census of Population</u>, Number of Inhabitants, Alaska, PC(1)-A3 Alaska, (Washington: USGPO, 1971), p. 3-19.

[A6120]

Census Division Subdivisions/Boroughs, Reservations, and Places

Figure 13.  Source:  U.S. Bureau of the Census, 1970 Census of
Population, Number of Inhabitants, Alaska,
PC(1)-A3 Alaska,(Washington: USGPO, 1971),
p. 3-20.

[A6121]

Census Division Subdivisions/Boroughs, Reservations, and Places

Figure 14. Source: U. S. Bureau of the Census, <u>1970 Census of Population</u>, Number of Inhabitants, Alaska, PC(1)-A3 Alaska, (Washington: USGPO, 1971), p. 3-21.

[A6122]

Census Division Subdivisions/Boroughs, Reservations, and Places

Figure 15.  Source:  U. S. Bureau of the Census, 1970 Census of
Population, Number of Inhabitants, Alaska,
PC(1)-A3 Alaska, (Washington: USGPO, 1970),
p. 3-22.

[A6123]

# ORDER ESTABLISHING AN INTERIM REAPPORTIONMENT PLAN FOR 1972 LEGISLATIVE ELECTIONS

This Court declared the Reapportionment and Redistricting Proclamation dated December 30, 1971, unconstitutional by its Decision and Order entered May 26, 1972. Pursuant to that Decision and Order, the Court appointed Dr. George W. Rogers and William H. Scott Masters to assist it in fashioning an interim reapportionment plan for the 1972 Alaska Legislative Elections.[1]

The Court, on May 26, 1972 gave the Masters the following written instructions:

1. By use of the official census of 1970, you should establish a population base for the State of Alaska. This population base should include military personnel who were enumerated in the 1970 Census.

2. You should make an inquiry to determine whether or not the number of nonresident military personnel included in the 1970 Census can be determined. If a determination can be made, then you should subtract the number from the total which you have arrived at in paragraph 1 above. You should also state the methods in detail by which you arrived at this determination.

3. Once you have determined the population base, you should divide the same by 40. This will give you the ideal number of persons to be included in a single member House district. You should then divide the population base by 20 which will represent the ideal population for a single member Senate district.

4. You should then establish House and Senate election districts containing a number of persons as close to the formula as feasible.

5. In establishing House and Senate districts, an effort should be made to make the districts correspond, where feasible, with the approximate boundaries set out in the 1971 reapportionment plan. No designated seats will be established within a multi-member district if multi-member districts are established. In establishing House and Senate districts you should, wherever feasible, create a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.

6. If there are any substantial deviations from the population norms, express, specific reasons should be set forth.

The Masters submitted a report on June 12, 1972. Thereafter, the Masters met with the Court on June 13, 1972, at which time the report was amended to reflect determinations made by the Court concerning the reapportionment plan.

The Court, now being fully advised in the premises, hereby makes and orders the following interim reapportionment plan for the 1972 legislative elections:

(1) By use of the Official Census of 1970, the Court determines that the total population base for the State of Alaska shall be 302,361. This figure includes the military population residing in the State of Alaska at the time of the Official Census of April, 1970. In the time available to the Court for the preparation of the interim plan, the Court could find no feasible method of excluding some or all of the military personnel from the total population base. Moreover, computations revealed that changes in representation under the interim plan due to the inclusion of military personnel were minimal.

---

1. We commend George W. Rogers, Professor of Economics at the University of Alaska, and Mr. William H. Scott, C.P.A., their legal assistant R. E. Hicks, and Mr. Richard Listowski, cartographic and statistical assistant, for the excellence of their performance in executing the Court's instructions.

(2) The Court determines that the ideal population norm for each member of the State House of Representatives should be 7,559, and that the ideal population norm for each member of the State Senate should be 15,118.

(3) House and Senate election districts with their boundaries indicated are depicted on the maps, Appendix 2, and are described geographically in Appendix 3. The population of each district, the number of seats, and the percentages of variations from the norms are set forth in Tables A and B of the Master's Report (pages 880 and 881, supra).

(4) The Court establishes twenty House Election Districts as follows:[2]

| House District | House District Name | Number of Seats |
|---|---|---|
| 1. | Ketchikan | 2 |
| 2. | Prince of Wales-Petersburg-Wrangell | 1 |
| 3. | Sitka | 1 |
| 4. | Juneau-Lynn Canal | 2 |
| 5. | Prince William Sound | 1 |
| 6. | Matanuska-Susitna | 1 |
| 7–10. | Anchorage | 16 |
| 11. | Cook Inlet | 2 |
| 12. | Kodiak (Urban) | 1 |
| 13. | Western Gulf of Alaska-Aleutian Islands | 1 |
| 14. | Bristol Bay | 1 |
| 15. | Bethel | 1 |
| 16. | Yukon-Koyukuk-Kuskokwim | 1 |
| 17. | Fairbanks | 6 |
| 18. | Nenana-McKinley | 1 |
| 19. | North Slope | 1 |
| 20. | Bering Straits | 1 |
| | Total | 40 |

(5) The Court establishes eleven Senate election districts as follows:

| Senate District | Senate District Name | Number of Seats |
|---|---|---|
| A. | Ketchikan | 1 |
| B. | Alexander Archipelago-East Gulf of Alaska | 1 |
| C. | Juneau-Lynn Canal | 1 |
| D. | Prince William Sound-Matanuska-Susitna | 1 |
| E. | Anchorage | 8 |
| F. | Cook Inlet | 1 |
| G. | Kodiak-Aleutians | 1 |
| H. | Bristol Bay-Bethel | 1 |
| I. | Interior Alaska | 1 |
| J. | Fairbanks | 3 |
| K. | North Slope-Bering Strait | 1 |
| | Total | 20 |

(6) Senators elected in 1970 shall continue in office until the end of their terms and shall represent the following districts:[3]

| | |
|---|---|
| Senate District A | Robert H. Ziegler, Sr. |
| Senate District C | Bill Ray |
| Senate District E | Chancy Croft, Ron L. Rettig, Lowell Thomas, Jr., Clifford J. Groh |
| Senate District G | Kathryn Poland |
| Senate District J | John Butrovich, Donald E. Young |
| Senate District K | Willie Hensley |

(7) For the purposes of the 1972 legislative elections, there shall be no designated seats within a multi-member House or Senate district.

(8) The time for completion of registration lists, designation of precincts and distribution of material as set forth in AS 15.07.140 and AS 15.10.080 is extended from forty (40) days prior to the primary election to twenty (20) days prior to said election.

2. The variances of the House districts, with the exception of the Ketchikan District, range from —2.7% to +4.3%, and the variations from the norm of the Senate districts, with the exception of the Ketchikan District, range from —2.3% to +4.3%.

The Ketchikan House and Senate districts vary from the norms by —22.5%. Within the time available, the Court was unable to reduce substantially this variance and still meet the mandate of the Alaska Constitution requiring a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area. A more extensive explanation of the variances is available in the Master's Report (pages 892 through 897, supra).

3. For an interim plan it is preferable not to shorten the terms of Senators, particularly as this may become a necessity upon the formulation of a permanent plan. The additions or substitutions of geographical areas under the interim plan have not so materially changed the population base which elected each of the Senators as to prevent them from adequately representing their designated districts. A comparison of the actual vote received by these Senators in the 1970 election with the new population base also reveals that they can continue to represent properly their districts.

(9) The parties shall have until noon, June 17, 1972 to file objections to this Order, in the Office of the Clerk of the Supreme Court at Juneau, Alaska.

(10) Jurisdiction is retained, and an opinion will be filed in due course.

DATED: June 14, 1972 at Anchorage, Alaska.

## ORDER DENYING OBJECTION TO INTERIM REAPPORTIONMENT PLAN

The court met on June 19, 1972, and considered objections to the interim reapportionment plan.

It is ordered:

1. Petitioners' objection to the inclusion in the population base of all military personnel who were enumerated in the 1970 census of Alaska, is denied.

The court could find no feasible basis for the exclusion of part or all of the military population from the population base required for interim reapportionment. Under the Alaska Constitution this base must include all residents of the State of Alaska as enumerated in the decennial census.[1] The base is not limited to voter population. Neither the 1971 reapportionment plan nor the materials relied upon by the petitioners provide a legal basis for identifying nonresident military personnel in order to eliminate them from the population base.[2]

In the absence of reliable data, the elimination of the military from the population base as a class of persons would be a denial of equal protection of the law, prohibited by the Fourteenth Amendment to the United States Constitution.[3]

2. The petitioners' objection which would require designation of seats in multimember districts in the interim plan is denied. We cannot accept the assertions of petitioners that the court was bound, in fashioning an interim plan, to use those methods employed in the 1971 Reapportionment Plan. In fashioning an interim plan, the court may use such techniques and remedies as it finds appropriate to effectuate the "one-man, one-vote" principle.

3. Petitioners' objection to the designation of incumbent Senators elected in 1970, as the representatives of the districts from which they were elected for the next two years, is denied.

In an interim plan it is preferable not to shorten the terms of Senators, particularly as foreshortening such terms may become a necessity upon the formulation of a permanent plan. The additions or substitutions of geographical areas under the interim plan have not so materially changed the population base which elected each of the Senators as to prevent them from adequately representing their designated districts. A comparison of the actual vote received by these Senators in the 1970 election with the new population base reveals that they can continue properly to represent their districts.

4. Objections received from some of the residents of Eagle River, Birchwood, Peters Creek, Fire Lake and Chugiak have been considered, but the court is unable to devise a feasible plan, fulfilling constitutional requirements which would place this area in the same election district and still permit proper representation in the

---

1. The census practice is described as follows:

   In accordance with census practice dating back to 1790, each person enumerated in the 1970 census was counted as an inhabitant of his usual place of residence, which is generally construed to mean the place where he lives and sleeps most of the time. This place is not necessarily the same as his legal residence, voting residence or domicile. (Census Report PC(1)–C3, Alaska, Appendix A at p. App–1)

2. The 1971 plan includes Coast Guard personnel, 3,752 resident aliens and those military dependents who were not living on military bases. These persons cannot be classified as citizens of the State under the test urged by the petitioners.

3. Davis v. Mann, 377 U.S. 678, 691, 84 S. Ct. 1441, 12 L.Ed.2d 609, 617 (1964). *See generally,* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

Matanuska-Susitna area and the Prince William Sound area, which have been combined to form Senate District D. All proposed combinations of population in the Eagle River-Birchwood area cause serious dislocation to adjoining districts. This would not be constitutionally permissible under the standards of the United States Supreme Court which we are bound to follow.[4]

5. Respondents' objection concerning the designation of Senator Don Young as an incumbent Senator from District J is denied. The interim plan designates Election Districts 16 and 18 to compose Senate District I. The 1972 election of a Senator from this area will provide representation of this rural area outside of urban Fairbanks. Senator Young resided in the election district from which he was elected and had been a resident of that district as required by the Alaska Constitution.[5] He was properly elected from such district, which had the majority of its voters in urban Fairbanks. In providing an interim plan, the court has broad power to determine those districts to be represented by incumbents.

DATED at Juneau, Alaska, this 20th day of June, 1972.

George F. Boney
Chief Justice
Jay A. Rabinowitz
Associate Justice
Roger G. Connor
Associate Justice
Robert C. Erwin
Associate Justice

I concur in the order except as to paragraph 1, thereof. I would eliminate from the population base those members of the military, unaccompanied by dependents, living in barracks, on ships, etc. They constitute 51.9 percent of the total number of military personnel enumerated in the census. (Master's Report, p. 886) My reasons for adopting this position will be set forth in a separate dissenting opinion.

Robert Boochever
Associate Justice

Appendix II to Order Establishing Interim Plan consists of two Interim Redistricting Maps.

## APPENDIX III–A

## CENSUS AND GEOGRAPHICAL BOUNDARY OUTLINES OF HOUSE DISTRICTS

HOUSE DISTRICT 1: Ketchikan

The census divisions of Ketchikan (CD–130) and Outer Ketchikan (CD–190), as defined for the 1970 census, form the boundary of House District 1. The geographical boundary of the Ketchikan House District extends to the U. S.-Canada International Boundary on the east and south into Dixon Entrance, north along the east coast of Prince of Wales Island, north into the Clarence Strait as far as Ernest Sound, and north following the mountain peaks that form the Unuk River drainage. (Pop. 11,717)

HOUSE DISTRICT 2: Prince of Wales-Petersburg-Wrangell

The census division of Prince of Wales (CD–200), Wrangell-Petersburg (CD–280), and Angoon (CD–030), as defined by the 1970 census, form the boundary of House District 2. The geographical boundary of this house district extends along the U. S.-Canada International Boundary on the east, south to the mountain peaks that form the Unuk River drainage, west along Ernest Sound just north of Meyers Chuck and Clarence Strait on the east side of Prince of Wales Island, through Dixon Entrance, west of Prince of Wales Island out to the

---

4. We have relaxed our rules to permit the filing of objections to the interim reapportionment plan by residents of the Eagle River-Chugiak-Birchwood area who were not parties to this litigation. The shortness of time for filing of objections, the inability of residents in the area to discuss the matter with the Attorney General, who would normally represent their interest, and the obvious public importance of the issue were considered to override the lack of formal representation.

5. *Cf.,* Pendleton v. Jackson, 256 So.2d 494 (Ct.App.La.1972).

International Water Boundary and along the east coast of Baranof Island in the Chatham Strait with the inclusion of only Tenakee Springs and Tenakee Inlet from Baranof Island, and north to the tip of Admiralty Island following a line east of Hawk Inlet and Funter and then down south into Stephens Passage and east to the international border along the mountain peaks which form the drainage from the south side of Endicott Arm. (Pop. 7,522)

## HOUSE DISTRICT 3: Sitka

The census division of Sitka (CD–220) and the enumeration districts (030–03, 04, 05, 06, 07, 08, 09, 10) taken from the Skagway-Yakutat (CD–230) census division, as defined by the 1970 census, form the boundary of House District 3. The geographical boundary of this house district extends to the U. S.-Canada International Border on the east along the peaks of Mt. Vancouver, Hubbard, Seattle, Armour, Hay and Fairweather, turning NNE at Mt. Fairweather to Mt. Harris, ESE to SE along the Chilkat Range to a point directly west of the tip of Admiralty Island, down the tip of northern Admiralty Island at a point west of the eastern shore as defined by the census enumeration district, west to the island tip of Tenakee Inlet and east to the mouth of the Tenakee Inlet, south along the east coast of Baranof Island following the Chatham Straits into Christian Sound, northeast along the International Water Boundary on the Pacific Ocean and north across the Malaspina Glacier to the Canada International Border at Mount Augusta. (Pop. 1,449)

## HOUSE DISTRICT 4: Juneau

The census division of Juneau (CD–110) and Haines (CD–100), and the enumeration district (EDO30–01) taken from the Skagway-Yakutat census division, as defined by the 1970 census, form the boundary of House District 4. The geographical boundary of the Juneau House District extends to the U. S.-Canada International Border on the NE from Mt. Foster to the boundary line for House District 2 just east of Entrance Island, up north along the peaks which form the drainage into Endicott Arm,

through Stephens Passage, across the tip of Admiralty Island as defined for districts 2 and 3, and across the Chilkat Range ending at the international border. (Pop. 15,-768)

## HOUSE DISTRICT 5: Prince William Sound

The census division of Seward (CD–210), Valdez-Chitina-Whittier (CD–260), Cordova-McCarthy (CD–808), and the Girdwood enumeration district (020–09) taken from the Anchorage census division, as defined by the 1970 census, form the boundary of House District 5. The geographical boundary of the Prince William Sound House District is the Gulf of Alaska on the south, inland along Gore Point to the peaks of the Kenai Mountains extending to a point along the shore west of Hope, across Turnagain Arm to a point west of Rainbow, east to Mt. Muir, NNE across the peaks of the Chugach Mountains crossing the Glenn Highway above Lake Tazlina and east of Tazlina Glacier Lodge, north to the source of the West Fork Gulkana River, northeast to a point south of Paxson, northeast to a point north of Slate Creek, along the peaks of the Range into the Mantasta Mountains, south into the Wrangell Mountains following the peaks of the range to the U. S.-Canada International Border, south along the border to Mt. Augusta, and across the Malaspina Glacier into the Gulf of Alaska. (Pop. 7,435)

## HOUSE DISTRICT 6: Matanuska-Susitna

The enumeration district (EDO20–01, 02, 04 and 78) (ED170–12, 09, 20, 10–14, 03, 17, 01, 19 and 04) of the Matanuska-Susitna and Anchorage census divisions, as defined by the 1970 census, form the boundary of House District 6. The geographical boundary of this house district flows along Cook Inlet north of Fire Island to a point south of Grants, west across the peak of Mount Spur to the peaks of the Alaska Range at a point north of the Chilligan River, north along the peaks of the range to Mt. Dall, SSE at a point south of Peters Creek, crossing the Alaska Railroad at a point south of Talkeetna, then west into the Talkeetna

Mountains to Lake Louise, south along the boundary formed with House District 5 to a point west of Hope, then northwest to a point north of Fire Island. (Pop. 7,670)

HOUSE DISTRICT 7: Northwest (Anchorage)

The census tract (4, 5, 6, 9, 11, 12, 8–48 and 8–49A) of the Greater Anchorage Area Borough as defined by the 1970 census, form House District 7. The geographical boundary of Northwest House District runs south along the set boundary separating Elmendorf Air Force Base from Fort Richardson between Six Mile Lake and Otter Lake to Oil Well Road, east on Oil Well Road on a straight line course to a point where it would intersect with a line extended from the end of Muldoon Road running north, south from this point to the Glenn Highway, west along the Glenn Highway to Pine Street, south along Pine Street to East 6th Avenue, east along East 6th Avenue to Boniface Parkway, south along Boniface Parkway to DeBarr Road, continuing west along DeBarr Road until it becomes 15th Avenue and continuing west to Orca Street, south on a line extended from Orca Street to Chester Creek, and continuing west along the natural boundary formed by Chester Creek into Knik Arm. (Pop. 38,818)

HOUSE DISTRICT 8: Spenard (Anchorage)

The census tract (13, 14, 19, 20, 21, 22 and 24–32) of the Greater Anchorage Area Borough, as defined by the 1970 census, form House District 8. The geographical boundary of the Spenard House District runs SE out of Knik Arm following the natural boundary formed by Chester Creek to the crossing of Chester Creek and the Old Seward Highway, south along the Old Seward Highway to Tudor Road, west along Tudor Road and continuing into West 44th Avenue to the Alaska Railroad, south along railroad to International Airport Road, west along International Airport Road to Jewel Lake Road, north on Jewel Lake Road to Lake Shore Drive, west along Lake Shore Drive to Aero Avenue, north on Aero Avenue to 36th Avenue, and west along 36th Avenue to the Corporate and Urban Limits boundary and NW into Knik Arm. (Pop. 23,102)

HOUSE DISTRICT 9: Northeast (Anchorage)

The census tracts (2–29, 1–6, 1–5, 2–7, 3, 7, 17, 16, 16–77A, 8–50, 15 and 17–105) of the Greater Anchorage Area Borough, as defined by the 1970 census, form the boundary of House District 9. The geographical boundary of the Northeast House District follows the boundary of House District 7 from its northern point in Knik Arm to the intersection of Chester Creek and Old Seward Highway, south along Old Seward Highway to 41th Avenue, east on 41th Avenue to Ingra Street, south on Ingra to 42nd Avenue, east on 42nd Avenue to the line extended south from Juneau Street, north along the extended line to 40th Avenue, east along 40th Avenue following the Anchorage Corporate Limits Boundary, turning north along the Limits Boundary and following the boundary to the line extended south from Pine Street, north along this line until it intersects with the boundary of Anchorage Precinct No. 31 (established 1969) at Northern Lights Boulevard and Pine Street, east along the precinct boundary and following the boundary to 32nd Avenue, east on 32nd Avenue to the Anchorage Corporate Limits, turning north and following the Anchorage Corporate Limits to the intersection of Baxter Road and Tudor Road, west along Tudor Road and following the Fort Richardson reservation boundary, north continuing to follow the boundary of Fort Richardson to its intersection with the natural divide between Ship Creek and South Eagle River drainage, southeasterly along the divide to the ridge of the Chugach Mountains, north to the natural divide between Eagle River and Peters Creek drainage, northwesterly along the divide to the intersection of Glenn Highway and Birchwood Loop Road, follow Birchwood Loop Road to Mink Creek, and Mink Creek to Knik Arm. (Pop. 38,-595)

HOUSE DISTRICT 10: South (Anchorage)

The census tracts (16–77A, 17–105, 18, 23, 25, 26, 27, 28, 31 and 020–80) of the Greater Anchorage Area Borough, as defined by the 1970 census, form the boundary of House District 10. The geographical boundary of House District 10 runs SW from Knik Arm just north of Hood Lake and follows the boundary of House District 8 to the intersection of the Anchorage Corporate Limits boundary and Old Seward Highway, and then follows the boundary of House District 9 from the Old Seward Highway intersection point to the Baxter Road and Tudor Road crossing, west along Tudor Road until the Fort Richardson boundary turns south, south along the military boundary until it turns west, west along the military boundary until it intersects with a line extended south from Boniface Parkway, north along this extended line to Tudor Road, and west along Tudor Road and following the Fort Richardson boundary. (Pop. 23,310)

## HOUSE DISTRICT 11: Cook Inlet

The census division of Kenai-Cook Inlet and the enumeration districts (ED 070–02, 03, 03B, 04, 05 and 06) of the Bristol Bay census division, as defined by the 1970 census, form the boundary of the Cook Inlet House District. The geographical boundaries of this House district run from a point north of Fire Island across Cook Inlet following the southern boundary of House District 6 to the Alaska Range, south along the peaks of the range to Telaquana Mountain and then SW to a point west of Illiamna, then west encircling Illiamna Lake to an easterly line between Kukalek Lake and Nonvianuk Lake and then SE into the Aleutian Range at a point west of Kaguyak on the Shelikof Strait, east to a point directly south of Cape Douglas, east along the waters between the Barren Islands and Chugach Islands, inland at Gore Point, and north along the peaks of the Kenai Peninsula to Fire Island. (Pop. 14,770)

## HOUSE DISTRICT 12: Kodiak

The enumeration districts (ED150–01–02, 03, 07, 10 and 17) of the Kodiak census division, as defined by the 1970 census, form the Kodiak House District. The geographical boundary of this house district runs from a point north of Two Headed Island going north to a point west of Old Harbor at the peaks which define the drainage area along the eastern side of the Island, and NNE to the northern tip of Spruce Island and along the International Water Boundary, returning again to Two Headed Island. (Pop. 7,568)

## HOUSE DISTRICT 13: Aleutian Islands

The enumeration districts (See Appendix 3–B) of the Aleutian Islands and Kodiak census divisions, as defined by the 1970 census, form the Aleutian Islands House District. The geographical boundary of House District 13 extends along the Alaska Peninsula from a point west of Weasel Mountain and following the peaks of the coastal mountains NE to the mountains west of Kaguyak, east to the north side of the Barren Islands out into the gulf, down the east of Kodiak Island along the International Water Boundary to the tip of the Aleutian Islands (Attu Island), turning east at Attu Island and going along the International Water Boundary, turning south through the Fenimore Pass and along the SE coast of the Aleutian Chain along the south side of the Shumagin Islands and Aanak Islands, turning inland again at Weasel Mountain along Chignak Bay. (Pop. 7,352)

## HOUSE DISTRICT 14: Bristol Bay

The enumeration districts of Bristol Bay, Aleutian and Bethel census divisions (See Appendix 3–B) and the Bristol Bay Borough census division, as defined by the 1970 census, form the Bristol Bay House District. The geographical boundary of House District 14 extends from a point in the Kilbuck Mountains on the head waters of the Kipchuk River and goes east along the peaks of the mountain chain, which includes Butch Mountain, into the Alaska Range just south of Hungry and Old Village, intersecting the western boundary of House District 11 at Talaquana Mountain, following the boundary of House District 11 to a point where House District 13 intersects west of Kaguyak, southwest along the

boundary of House District 13 to Cape Kiqun on Atka Island, out along the International Water Boundary to include the Pribilof Islands, returning to the mainland at a point just north of Quinhaqak, then along the peaks of the Great Range at a point north of Eek Lake and back to the source of the Kipchuk River.  (Pop. 7,361)

## HOUSE DISTRICT 15: Bethel

The enumeration districts (see Appendix 3–B) of Nome, Bethel and Wade Hampton, as defined by the 1970 census, form the Bethel House District.  The geographical boundary of House District 15 extends from a point in the Kilbuck Mountains on the head waters of the Kipchuk River and goes north to a point north of Mt. Hamilton, turning west across the Kuskokwim River just north of Tuluksak, continuing west to the Tundra River just south of Big Fritz, turning NW to a point on latitude 62° just west of Pitkas Point across the Yukon River, south from latitude 62° along the Aphrewn River to a point south of Shevak on the River, NW from Chevak into the Bering Sea at a point north of Cape Romanzof.  The boundary extends SW of the point in the Kilbuck Mountains following the boundary of House District 14 into the Bering Sea to the International Water Boundary including Nunviak and St. Mathew Islands.  (Pop. 7,671)

## HOUSE DISTRICT 16: Yukon-Kuskokwim-Koyukuk

The enumeration district of Wade Hampton, Kuskokwim, Upper Yukon and Yukon-Koyuku (See Appendix 3–B), as defined in the 1970 census, form House District 16. The geographical Boundary of this house district extends from a point at the U. S.–Canada International Border on the Tatonduk River and runs west along a line north of Chena Hot Springs to the Steese Highway south of Mount Ryan crossing the Elliott Highway at a point directly west of Mount Ryan, and running SW between the Tatalina River and the Tolovana River to a point just east of Tolovana on the Yukon River, turning south into the Alaska Range along a line running east of Toklat and Nineteen Mile to the boundary of Mt.

McKinley National Park just east of Kantisna, west following the Park boundary skirting north of Kantisna and turning west into the Park interior, running SW across the Park crossing between the head waters of Herron and Foraker River and Mt. Forker and Mt. McKinley, exiting the Park boundary just east of Mt. Russell and intersecting the boundary of House District 6 just NE of Mt. Dall, following the boundary of House District 6 from this point of intersection south to the intersection of the boundaries of House District 11 and 6 and continuing south along the boundary of House District 11 to a point SE of Mt. Telaquana, turning west at this point and following the boundary of House District 14 to the boundary of House District 15 at the head waters of the Kipchuk River in the Kilbuck Mountains, turning north at this point and following the House District 15 boundary north to a point north of Mt. Hamilton, turning west at Mt. Hamilton and following the House District 15 boundary to a point on latitude 62° just west of Pitkas Point across the Yukon River, turning NE and following the peaks of the mountain range just west of the Andreafsky River to the northern tip of that range, south to the northern peak of the mountain range running just of East Fork River, west to the mountain range running west of the Anuik River, turning NE along this mountain range and following a course running just east of Old Women Cabin and Ten Mile Cabin, turning directly north at a point east of Ten Mile Cabin and extending to Traverse Peak, north from Traverse Peak to a point south of Purcell Mountain, east from Purcell Mountain to the Hogatza River just north of Hog River, NE on a course between Noautak Lake and Siruk Creek, north on the east side of Walker Lake into the Schawatka Mountains, and NE following the peaks of Schwatka, Endicott, Phillip Smith and Davidson Mountains to the U. S.–Canada International Boundary just north of Rapid River.  (Pop. 7,635)

## HOUSE DISTRICT 17: Fairbanks

The enumeration district (See Appendix 3–B) of the Fairbanks census division, as

defined by the 1970 census, form the House District 17 boundary. The geographical boundary of the Fairbanks House District extends from a point on the boundary of House District 16 just north of West Point and runs west along a line north of Chena Hot Springs to the Steese Highway just south of Mount Ryan, turning SW and crossing the Alaska Highway south of Fox and continuing SW between Happy and College and west of Ester to Cache on the Alaska Railroad, south crossing the Tanana River and following the Wood River SE to the Wood River drainage at the foot of the Alaska Range, east along the foot of the Alaska Range to the Alaska Highway-Tanana River Crossing, NE just west of Shaw Creek to Charley River directly east of longitude 144°, following longitude 144° north to a point just directly east of West Point, and NW intersecting the House District 16 boundary just north of West Point. (Pop. 45,664)

## HOUSE DISTRICT 18: Nenana-McKinley

The census division of southeast Fairbanks and the enumeration districts of the Fairbanks Yukon-Koyukuk and Matanuska-Susitna census districts (See Appendix 3–B) as defined in the 1970 census, form the House District 18 boundary. The geographical boundary of the Nenana-McKinley House District extends from a point on the U. 'S.–Canada Border and follows the boundary of House District 5 NW to the point at which it intersects the boundary of House District 6 just west of Lake Louise, continuing west along the boundary of House District 6 to a point at which it intersects the boundary of House District 16 just north of Mt. Dall, and north along the boundary of House District 16 following the boundary to the U. S.—Canada International Border. (Pop. 7,419)

## HOUSE DISTRICT 19: North Slope
The census districts of Barrow and Kobuk and the enumeration districts of the Upper Yukon census division (See Appendix 3–B), as defined by the 1970 census, form the boundary of House District 19. The geo-graphical boundary of the North Slope House District extends from a point on the U. S.–Canada Border just north of Rapid River and follows the boundary of House District 16 west to a point at which it inter-sects with the boundary of House District 20 at Traverse Peak, which is east of the Seward Peninsula, west from Traverse Peak to the South Fork of the Buckland River, turning SW to a point north of Hay-cock, west along the Koyuk River on the north side, passing between Kuzitrin Lake and Imurak Lake, going NW just north of Aurora to a point just east of Serpentine Hot Springs, turning SW just west of Mid-night Mountain, going west to the headwa-ters of Arctic River, and following the River north into Shishmaref Inlet to the U. S. S. R.-U. S. International Boundary. (Pop. 7,666)

## HOUSE DISTRICT 20: Bering Strait-Norton Sound

The census division of Nome and the enumeration districts of Wade Hampton (See Appendix 3–B), as defined by the 1970 census, form the boundary of House District 20. The geographical boundary of the Bering Strait-Norton Sound House Dis-tricts extends from U. S.-U. S. S. R. Inter-national Boundary and follows the bound-ary of House District 19 east to the point at which it intersects with the boundary of House District 16 at Traverse Peak, turn-ing south of boundary line of House Dis-trict 16 to a point at which it intersects with the boundary of House District 15 at Lati-tude 62° just south of the Yukon River and west of Pitkas Point, and follows the bound-ary line of House District 15 to the U. S.-U. S. S. R. International Boundary. St. Lawrence Island is included in this House District. (Pop. 7,660)

Reference Maps:
>United States Department of Interior Geographical Survey, Alaska—Map E, 1954
>(House Districts 1–6 and 11–20)
>Alaska Department of Highways Aeri-al Photography Map, September, 1969
>(Anchorage House Districts 7–10)

APPENDIX III-B

MASTERS' PROPOSED REAPPORTIONMENT PLAN

(LEGAL DESCRIPTION BY REFERENCE TO CENSUS DATA)

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 1 Ketchikan | Ketchikan | 10,041 | | | |
| | Outer Ketchikan | 1,676 | | | |
| | | 11,717 | | | 11,717 |
| 2 Prince of Wales Wrangell Petersburg | Prince of Wales | 2,106 | | | |
| | Wrangell-Petersburg | 4,913 | | | |
| | Angoon | 503 | | | |
| | | 7,522 | | | 7,522 |
| 3 Sitka | Sitka | 6,109 | 030-03-04 05-06-07 08-09-10 Yakutat | 1,449 | |
| | | | | | 7,558 |
| 4 Juneau | Haines | 1,504 | 030-01 Skagway | 708 | |
| | Juneau | 13,556 | | | |
| | | 14,060 | | 708 | 15,768 |
| 5 Prince William Sound | Seward | 2,336 | 020-09 Girdwood | 144 | |
| | Valdez-Chitna | | | | |
| | Whittier | 3,098 | | | |
| | Cordova-McCarthy | 1,857 | | | |
| | | 7,291 | | 144 | 7,435 |
| 6 Matanuska-Susitna | | | 170-12 Bay City | 36 | |
| | | | 170-09 Big Lake | 448 | |
| | | | 170-20 Butte | 69 | |
| | | | 170-10 Houston | 7 | |
| | | | 170-14 Long Island | 33 | |
| | | | 170-03 Montana | 1,140 | |
| | | | 170-17 Palmer | 76 | |
| | | | 170-01 Sutton | 300 | |
| | | | 170-19 Wasilla | 38 | |
| | | | 170-04 Willow | 3,159 | |
| | | | 170--- Remainder | 5,306 | |

[A67121]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 6 Matanuska-Susitna continued | | | 020-02  Peters Creek | 340 | |
| | | | 020-78  Peters Creek Drainage | 291 | |
| | | | 020-01  Eklutna | 25 | |
| | | | 020-04  Chugiak | 489 | |
| | | | 020-03  Birchwood | 1,219 | |
| | | | | 2,364 | 7,670 |
| 7 Northwest (Anchorage) | | | 4----  Elmendorf | 7,141 | |
| | | | 5----  Elmendorf - Government Hill | 9,517 | |
| | | | 6----  Mountain View | 5,226 | |
| | | | 9----  Fairview | 3,845 | |
| | | | 10----  Fairview | 3,369 | |
| | | | 11----  Central Business | 2,118 | |
| | | | 12----  Inlet View | 4,248 | |
| | | | 8-48   Mountain View | 1,397 | |
| | | | 8-49A  Mountain View | 1,957 | |
| | | | | 38,818 | 38,818 |
| 8 Spenard (Anchorage) | | | 13----  Turnagain | 3,183 | |
| | | | 14----  West Chester | 4,026 | |
| | | | 19----  Spenard Business | 2,457 | |
| | | | 20----  Spenard South | 4,322 | |
| | | | 21----  Woodland Park | 4,481 | |
| | | | 22----  Turnagain South | 2,748 | |
| | | | 24-32  Lake Spenard | 1,885 | |
| | | | | 23,102 | 23,102 |
| 9 Northeast (Anchorage) | | | 2-79  Peters Creek Drainage | 556 | |
| | | | 1-6  Fire Lake | 12 | |
| | | | 1-5  Fire Lake | 475 | |

CA67133

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|---|
| 9 Northeast continued (Anchorage) | | | | | | |
| | | | 2-7 | Eagle River | 2,425 | |
| | | | 3----- | Fort Richardson | 10,751 | |
| | | | 7----- | Muldoon North | 7,872 | |
| | | | 17----- | Muldoon South | 8,743 | |
| | | | 16----- | City View | 4,734 | |
| | | | 16-77A | City View | 562 | |
| | | | 8-50 | Russian Jack | 757 | |
| | | | 15----- | Lake Otis | 3,543 | |
| | | | 17-105 | | 711 | |
| | | | | | 38,595 | 38,595 |
| 10 South (Anchorage) | | | | | | |
| | | | 16-77A | | 562 | |
| | | | 17-105 | | 711 | |
| | | | 18----- | | 4,310 | |
| | | | 23----- | | 4,626 | |
| | | | 25----- | | 3,516 | |
| | | | 26----- | | 1,876 | |
| | | | 27----- | | 2,910 | |
| | | | 28----- | | 3,152 | |
| | | | 31----- | | 1,481 | |
| | | | 020-80 | Turnagain Arm | 166 | |
| | | | | | 23,310 | 23,310 |
| 11 Cook Inlet | Kenai Cook Inlet | 14,250 | | | | |
| | | | 070-06 | Iguigig | 36 | |
| | | | 070-03 | Iliamna | 59 | |
| | | | 070-05 | Kakhonak | 88 | |
| | | | 070-03 | Newhalen | 88 | |
| | | | 070-02 | Nondalton | 184 | |
| | | | 070-04 | Pedro Bay | 65 | |
| | | | | | 520 | 14,770 |

[A6714]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 12 Kodiak | | | 150-03 Kodiak | 3,798 | |
| | | | 150-16 Kodiak Naval Station | 3,052 | |
| | | | 150-01 Ouzinki | 160 | |
| | | | 150-02 Port Lions | 227 | |
| | | | 150-07 Woody Island | 41 | |
| | | | 150-10 Old Harbor | 290 | |
| | | | | 7,568 | 7,568 |
| 13 Aleutian Islands | | | 010-03 Adak Station | 2,249 | |
| | | | 050-03C Adak NRS at Mt. Moffet | 527 | |
| | | | 010-01 Atka | 88 | |
| | | | 150-13 Akhiok | 115 | |
| | | | 150-08- 09-14 Area I-Remainder | 1,460 | |
| | | | 010-03B Clam Lagoon | 1,246 | |
| | | | 150-15 Kaguyak | 59 | |
| | | | 150-12 Karluk | 98 | |
| | | | 150-11 Larsen Bay | 109 | |
| | | | 010-05 Shemya Station | 1,131 | |
| | | | 010--- Remainder | 270 | |
| | | | | 7,352 | 7,352 |
| 14 Bristol Bay | Bristol Bay Borough | 1,147 | 010-28 Akutan | 101 | |
| | | | 010-20 Belkofski | 59 | |
| | | | 010-08 Chignik | 83 | |
| | | | 010-10 Chignik Lake | 117 | |
| | | | 010-23 Cold Bay | 256 | |
| | | | 010-25 False Pass | 62 | |
| | | | 010-12 Ivanof Bay | 48 | |

EA6715]

| HOUSE DISTRICT | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| [Number & Name] | | | [Code Number & Name] | | |
| 14 Bristol Bay continued | | | | | |
| | | | 010-22 King Cove | 283 | |
| | | | 010-15 Nelson Lagoon | 43 | |
| | | | 010-32 Nikolski | 57 | |
| | | | 010-26 Pavlof Harbor | 39 | |
| | | | 010-13 Perryville | 94 | |
| | | | 010-35 St. George | 163 | |
| | | | 010-16 Sand Point | 360 | |
| | | | 010-18 Squaw Harbor | 65 | |
| | | | 010-36 St. Paul | 450 | |
| | | | 010-30 Unalaska | 178 | |
| | | | 010--- Remainder | 88 | |
| | | | | 2,546 | |
| | | | 050-29 Kwinhagak | 340 | |
| | | | 050-30 Mumtrak | 218 | |
| | | | 050-31 Platinum | 57 | |
| | | | 050--- Port Newenham | 88 | |
| | | | | 703 | |
| | | | 070-13 Aleknagik | 128 | |
| | | | 070-13B Aleknagik Outskirts | 91 | |
| | | | 070-11 Clarks Points | 95 | |
| | | | 070-15 Dillingham | 914 | |
| | | | 070-23 Egegik | 153 | |
| | | | 070-11B Ekuk | 51 | |
| | | | 070-10 Ekwok | 103 | |
| | | | 070-08 Koliganek | 142 | |
| | | | 070-22 Levelock | 98 | |
| | | | 070-16 Manokotak | 214 | |
| | | | 070-09 New Stuyahok | 216 | |
| | | | 070-24 Pilot Point | 68 | |
| | | | 070-26 Port Heiden | 81 | |

[A6716]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 14 Bristol Bay continued | | | 070-18 Togiak | 383 | |
| | | | 070-17 Twin Hills | 67 | |
| | | | 070--- Remainder | 161 | |
| | | | | 2,965 | 7,361 |
| 15 Bethel | | | 050-10 Akiachak | 312 | |
| | | | 050-12 Akiak | 184 | |
| | | | 050-03 Akolmiut | 526 | |
| | | | 050-04 Akolmiut Outskirts | 97 | |
| | | | 050-06 Bethel | 2,416 | |
| | | | 050-19 Chefornak | 146 | |
| | | | 050-28 Eek | 186 | |
| | | | 050-22 Kipnuk | 325 | |
| | | | 050-22B Kipnuk Outskirts | 264 | |
| | | | 050-21 Kongiganak | 190 | |
| | | | 050-21B Kwigillingok | 148 | |
| | | | 050-11 Kwethluk | 408 | |
| | | | 050-25 Mekoryuk | 249 | |
| | | | 050-05 Napakiak | 259 | |
| | | | B,C Napaskiak | 188 | |
| | | | 050-15 Newtok | 114 | |
| | | | 050-18 Nightmute | 127 | |
| | | | 050-09 Oscarville | 41 | |
| | | | 050-16 Tanunak | 274 | |
| | | | 050-17 Toksook | 257 | |
| | | | 050-02 Tuluksak | 195 | |
| | | | 050-20 Tuntutuliak | 158 | |
| | | | | 7,064 | |
| | | | 270-25 Cape Romanzorf A.F. Station | 96 | |
| | | | 270-20 Hooper Bay | 490 | |
| | | | 270--- Remainder | 21 | |
| | | | | 607 | 7,671 |

[A6718J]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | ENUMERATION DISTRICT [Code number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 16 Yukon Koyukuk Kuskokwim | Kuskokwim | 2,306 | 270-04 Marshall | 175 | |
| | | | 270-05 Pilot Station | 290 | |
| | | | 270-07 Pitkas Point | 137 | |
| | | | 270-06 St. Marys | 384 | |
| | | | 270-01 Russian Mission | 146 | |
| | | | | 1,132 | |
| | | | 290-3 Allakalet | 174 | |
| | | | 290-38D Campton A.F.Base | 143 | |
| | | | 290-01 Evansville | 57 | |
| | | | 290-15 Galena | 302 | |
| | | | 290-15B Galena A.F.Base | 279 | |
| | | | 290-05 Hughes | 85 | |
| | | | 290-10 Huslia | 159 | |
| | | | 290-20 Kaltag | 206 | |
| | | | 290-14 Koyukuk | 124 | |
| | | | 290-25 Manley Hot Springs | 55 | |
| | | | 290-31 Minto | 168 | |
| | | | 290-12 Nulato | 308 | |
| | | | 290-24 Rampart | 36 | |
| | | | 290-21 Ruby | 147 | |
| | | | 290-06 Tanana & Outskirts | 411 | |
| | | | 290-- Remainder | 261 | |
| | | | | 2,915 | |
| | | | 250-06 Arctic Village | 85 | |
| | | | 250-09 Beaver | 101 | |
| | | | 250-17 Chalkyitsik | 130 | |
| | | | 250-15-14 Central & Circle Springs | 42 | |
| | | | 250-13 Circle | 54 | |
| | | | 250-22 Eagle | 103 | |
| | | | 250-18 Fort Yukon | 448 | |
| | | | 250-20 Fort Yukon A.F.Base | 85 | |
| | | | 250-10 Stevens | 74 | |
| | | | 250-08 Venetie | 112 | |
| | | | 250-- Remainder | 48 | |
| | | | | 1,282 | |
| | | | | | 7,635 |

[A6719]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 17 Fairbanks | | | 090-23 Aurora-Johnston | 1,464 | |
| | | | 090-24 College | 3,434 | |
| | | | 090-36-37 Eielson | 6,149 | |
| | | | Ester | 264 | |
| | | | 090-01 Fairbanks | 14,771 | |
| | | | 090--- Fairbanks Outskirts | 8,119 | |
| | | | 090-21 Graehl | 349 | |
| | | | 090-22 Lemeta | 1,318 | |
| | | | 090-28 North Pole | 265 | |
| | | | 090-25 South Bjerremark | 402 | |
| | | | 090--- Remainder | 32 | |
| | | | 090-38-39 Wainwright | 9,097 | |
| | | | | 45,664 | 45,664 |
| 18 Nenana-McKinley | Southeast Fairbanks | 4,179 | 290-34 Anderson & Outskirts | 788 | |
| | | | 290-39 Cantwell | 98 | |
| | | | 290-38C Healy | 79 | |
| | | | 290-32 Nenana | 362 | |
| | | | 290-32B North Nenana | 135 | |
| | | | 290-38B Suntrana | 67 | |
| | | | 290-38D Healy-Suntrana-Usibelli Mine Area | 141 | |
| | | | 290-36B Usibelli | 102 | |
| | | | 290-38 Usibelli Mine | 65 | |
| | | | | 1,837 | |
| | | | 170-01 Summit | 34 | |
| | | | 170-02 Talkeetna | 182 | |

[A6720]

| HOUSE DISTRICT [Number & Name] | CENSUS DIVISION | 1970 CENSUS POPULATION | TRACT NUMBER AND ENUMERATION DISTRICT [Code Number & Name] | 1970 CENSUS POPULATION | HOUSE DISTRICT TOTAL POPULATION |
|---|---|---|---|---|---|
| 18 Nenana-McKinley continued | | | | | |
| | | | 170--- Remainder | 987 | |
| | | | | 1,203 | |
| | | | 090-30 Murphy Dome | 200 | 7,419 |
| 19 North Slope | Barrow | 2,663 | | | |
| | Kobuk | 4,434 | | | |
| | | | 250-02B Deadhorse | 163 | |
| | | | 250-01 Kaktovik | 123 | |
| | | | 250-02 Prudhoe Bay & Outskirts | 54 | |
| | | | 250--- Remainder | 62 | |
| | | | | 402 | |
| | | | 180-06 Shishmaref | 267 | 7,666 |
| 20 Bering Straight Norton Sound | Nome | | | | |
| | | | 270-15 Alakanuk | 414 | |
| | | | 270-24 Chevak | 387 | |
| | | | 270-14 Emangok | 439 | |
| | | | 270-11B Kotlik | 228 | |
| | | | 270-08 Mountain Village | 419 | |
| | | | 270-19 Scammon | 166 | |
| | | | 270-16 Sheldon Point | 125 | |
| | | | | 2,178 | |
| | | | 180-10 Brevig | 123 | |
| | | | 180-07 Diomede | 84 | |
| | | | 180-24 Elim | 174 | |
| | | | 180-04 Gambell | 372 | |
| | | | 180-23B Golovin | 117 | |
| | | | 180-26 Koyuk | 122 | |
| | | | 180-16 Nome | 2,488 | |
| | | | 180-31 St. Michael | 207 | |
| | | | 180-03 Savoonga | 364 | |
| | | | 180-28 Skaktoolik | 151 | |
| | | | 180-32 Stebbins | 231 | |
| | | | 180-11 Teller | 220 | |
| | | | 180-30 Unalakleet | 434 | |
| | | | 180-09 Waler | 131 | |
| | | | 180-21 White Mountain | 87 | |
| | | | 180--- Remainder | 177 | |
| | | | | 5,482 | 7,660 |

(467223)